In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 06-2142

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN SCHALK,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 30026—**Jeanne E. Scott**, *Judge.*

---

ARGUED OCTOBER 31, 2007—DECIDED FEBRUARY 12, 2008

---

Before EASTERBROOK, *Chief Judge*, and BAUER and WILLIAMS, *Circuit Judges*.

BAUER, *Circuit Judge.* Defendant-Appellant Steven Schalk brings this appeal, challenging various evidentiary rulings made during his jury trial in the district court. In particular, Schalk argues that the district court erred by allowing the government to introduce hearsay to bolster its cooperating witnesses' testimony, and that the evidence presented failed to prove that Schalk conspired to distribute more than five kilograms of cocaine, such that no reasonable jury could find Schalk guilty of that crime. We AFFIRM *in toto*.

## I. Background

Schalk was a drug dealer in the Chicagoland area. He regularly sold large quantities of marijuana and cocaine to Joshua Sowers, who in turn, sold smaller but still substantial quantities of cocaine to Michael Meneghetti. Sowers and Meneghetti lived in the Springfield, Illinois area.

In a typical transaction, Meneghetti paid Sowers $900 per ounce of cocaine, and Meneghetti would keep the profits made by his resale. However, when Meneghetti ran into financial difficulties, Sowers agreed to sell the cocaine to him for $780 per ounce, which was "at cost" according to Sowers. At times, Sowers "fronted" the cocaine to Meneghetti and Meneghetti paid Sowers later.

Meneghetti knew Sowers's drug supplier was a man named Steve (who turned out to be the defendant, Steven Schalk), whom Meneghetti had met on three separate occasions.[1] During two of the meetings with Schalk, Meneghetti witnessed Sowers give Schalk bags of money and Schalk give Sowers significant amounts of cocaine. Meneghetti never had any direct agreement with Schalk to sell or distribute cocaine.

In January 2005, Meneghetti was arrested for delivery of cocaine. In an effort to "help himself," Meneghetti contacted an agent with the Drug Enforcement Agency ("DEA"), Tom Bonnett. Agent Bonnett provided Meneghetti with a device that enabled him to record telephone conversations with Sowers, from whom he claimed to have

---

[1] In June 2004, Meneghetti also drove with Sowers to Schalk's mother's house in Lake Villa, Illinois, where Sowers went into the house with a bag containing at least $10,000 and came out with an encyclopedia-sized brick of cocaine. Schalk was not present for the actual exchange.

been purchasing about two or three ounces of cocaine each week for about eight months.

Meneghetti began taping phone conversations with Sowers immediately. The first taped conversation took place on January 21, 2005, and included references to Sowers's plan to meet with an unnamed man, and concerns that the unnamed man might tell Sowers to meet him halfway. In another call later that day, Sowers said that the man was on his way and would be there by noon, but that he was not answering his phone, since the man did not want "to talk on his phones like that anyway." Meneghetti said that he had "people waiting," to which Sowers responded, "Trust me, dog. I'm trying to get this to you as fast as [I] can so you can get this debt paid off."

A few days later, Monday, January 24, 2005, Meneghetti taped more conversations. After he avoided Sowers for two days, Meneghetti was told by Sowers that his unavailability created a "hell of an inconvenience for [him]" and caused him to get his "ass chewed." When Meneghetti said that he could deliver $1,000 to Sowers that day and more on Friday, Sowers asked, "You got anybody with, anybody wanting some right now with money up front?" In a subsequent call that day, Sowers again told Meneghetti that he "got [his] ass chewed 'cause of [him]," to which Meneghetti replied, "Steve was pissed?" Sowers's response was unintelligible.

Later that same day, Meneghetti recorded a conversation that took place in Sowers's bedroom. During that conversation, Sowers confirmed that "Steve" was going out of town, and that he had to "meet [Steve] tomorrow with whatever [he] can get." Meneghetti asked Sowers if he was going to "be out" the whole time Steve was gone, to which Sowers replied, "I'll have some for you. Oh yeah, that's why I'm meeting him Wednesday."

On Wednesday, January 26, 2005, Sowers drove to a restaurant where he met Schalk. In the parking lot, Sowers gave Schalk $9,000 and Schalk gave Sowers eleven ounces of cocaine. After that meeting, police followed Sowers until he exited the highway, where they arrested him and found the cocaine in the center console of his car. He consented to a search of his house, where DEA agents found an ounce of cocaine, twenty-three pounds of marijuana, and two notebooks in which Sowers recorded his drug transactions.

After his arrest, Sowers entered into an agreement with the government, promising to assist law enforcement in the investigation and prosecution of Steve Schalk with an expectation of leniency for himself later. Sowers told police that he began dealing drugs with Schalk sometime in 2003. He said that initially Schalk just gave him marijuana to sell, but after a couple of months, Schalk also started fronting him cocaine after Sowers told him that he "could sell it." As Schalk found out, Sowers proved to be truthful, and the two reached an agreement that Schalk would front Sowers drugs, and Sowers would pay for the drugs after he sold them. Sowers estimated that he received approximately twenty to thirty pounds of marijuana at a price of $1,600 per pound, and nine to eighteen ounces of cocaine at $780 per ounce, every two weeks between August 2003 and his January 26, 2005 arrest.[2] According to Sowers, he and Schalk kept track of these transactions using ledger books, which they regularly updated to reflect only Sowers's outstanding debts. At the time of his arrest, Sowers said he owed Schalk $140,000.

---

[2] Sowers said there was a single one-month gap during which he did not receive any drugs from Schalk.

Like Meneghetti, Sowers allowed police to record his conversations with Schalk. On February 9, 2005, Sowers recorded a meeting with Schalk at a Normal, Illinois restaurant. The two men discussed Sowers's debt to Schalk. During that discussion, Sowers referred to their "books" and said he owed "one hundred and fifty grand," to which Schalk responded, "Yeah, it's up there. . . . That's about where I'm at." At that meeting, Sowers gave Schalk $3,000 (which the DEA had provided) and told him that he could deliver another $15,000 or $20,000 in a couple of days. The two men agreed to meet again in a few days, and Schalk said "[T]he main thing is . . . you just gotta get this money. . . . [W]rite down how much you're short, you know what I'm saying? Go through . . . your books and see what people you know. . . ."

Sowers and Schalk met again on February 11, 2005 at a restaurant in Coal City, Illinois. At that meeting, Sowers wore a hidden recorder and brought with him fifteen stacks of bills, packaged to look like $15,000. During the meeting, Schalk said "You wanna take the ride up; I got some put away." Sowers said he was not "gonna drive" (apparently to Chicago) for "three or four ounces." Sowers told Schalk he should have brought his book with him, and Schalk replied that his "notepad" had "three sheets" that "showed what the numbers are." Schalk also said "When I come down Sunday, I'll rip paper; I'll [write] exactly what it is. . . . Get that number; yeah, erase everything but that." Sowers and Schalk then left the restaurant and Sowers reached into his truck for the $15,000 for Schalk, and DEA agents arrested them both.

After Schalk's arrest, DEA agents executed a search warrant at Schalk's mother's house. The agents found a combination safe in a bedroom closet that contained the $3,000 that Sowers had given Schalk two days prior and a notebook that contained account ledgers. The agents compared the figures in Schalk's notebook with Sowers's

notebook, and noticed that a three-page ledger labeled "Jo" had many similar (if not identical) entries. The number "99385" appeared at the beginning of the "Jo" ledger in Schalk's notebook and Sowers's notebook. Both ledgers contained, in the same order, seven identical entries, each of which were evenly divisible by 780: the price that Schalk charged Sowers per ounce of cocaine.

Both notebooks also contained ten identical subtractions in virtually the same order, which corresponded to payments made to Schalk by Sowers. The last addition and subtraction to Schalk's notebook read "8580" and "3000," respectively, which reflected the price of eleven ounces (11 x 780 = 8580) of cocaine sold to Sowers on January 26, 2005 and Sowers's payment of $3,000 to Schalk on February 9, 2005. In total, both notebooks reflected transactions for approximately ninety pounds of marijuana and 4.65 kilograms of cocaine sold by Schalk to Sowers during the period covered by the notebooks.

A grand jury indicted Schalk on one count of conspiracy to distribute marijuana and five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Schalk pleaded not guilty and exercised his right to a jury trial.

In pre-trial motions, Schalk moved *in limine* to exclude from evidence both sets of recorded conversations, as well as Sowers's drug ledgers.[3] Schalk sought to exclude the recordings on hearsay grounds. The government responded that Meneghetti's statements were admissible for the context of Sowers's statements, and Sowers's statements were admissible because he was a co-conspirator with Schalk. As for the conversations between Sowers

---

[3] Those motions did not seek to exclude Schalk's own statements from the recorded conversations.

and Schalk, the government argued that Sowers's statements on those tapes were admissible for context only. Schalk also moved *in limine* to exclude Sowers's drug ledgers, arguing that they were irrelevant and unfairly prejudicial. The government stated that it could establish at trial through the requisite foundation that the ledgers were admissible under the "business records" exception to hearsay. The district court denied all of Schalk's motions, and the case proceeded to trial.

At trial, the government called ten witnesses, including Meneghetti and Sowers. During the government's case-in-chief, the district court admitted, over Schalk's continuing objection, the audio recordings of Meneghetti's conversations with Sowers and Sowers's conversations with Schalk. The government also presented for identification the two notebooks found at Sowers's house, but the government did not move to admit them into evidence. During Schalk's cross-examination of DEA Agent Bonnett, the government and Schalk jointly moved to admit the notebooks into evidence, and the court admitted them. The government also moved to admit the notebook found in the safe at Schalk's mother's house; Schalk's counsel stated on the record that he did not object to the admission of the three pages of Schalk's notebook which reflected his transactions with Sowers, and the court admitted into evidence that notebook as well.[4]

The jury found Schalk guilty as charged. The jury also found by special verdict that Schalk conspired to distribute at least five kilograms of cocaine. On April 19,

---

[4] Schalk's attorney stated that he agreed to the notebook's entry into evidence, but subject to the limitation that the jury only see the three pages of the notebook that reflected transactions with Sowers, and not any other customers uninvolved in the charged conspiracy.

2006, the district court imposed a sentence of 240 months' imprisonment, followed by ten years' supervised release. Schalk timely appealed.

## II.  Discussion

On appeal, Schalk argues that the district court erred by allowing the government to introduce unreliable and unfairly prejudicial hearsay to bolster Meneghetti and Sowers's testimony against Schalk by (1) admitting the recorded conversations between Meneghetti and Sowers, and Sowers and Schalk; and (2) admitting Sowers's drug ledgers. Schalk's brief is unclear as to which ledgers he feels were improperly admitted into evidence. Because Schalk did not move *in limine* to prevent the admission of Schalk's own drug ledger, and because he affirmatively stated at trial that he had no objection to its admission, any potential argument regarding Schalk's drug ledger is waived. *See United States v. Redditt*, 381 F.3d 597, 602 (7th Cir. 2004) (when attorney affirmatively states that he does not object to the admission of evidence, he has waived any right to appellate review of such admission); *United States v. Pittman*, 319 F.3d 1010, 1012 (7th Cir. 2003) (same).

We review the district court's evidentiary rulings regarding alleged hearsay for abuse of discretion. *United States v. Robbins*, 197 F.3d 829, 837 (7th Cir. 1999). We shall not overturn erroneous evidentiary rulings if the error is harmless. *United States v. Prude*, 489 F.3d 873, 877 (7th Cir. 2007); *United States v. Chavis*, 429 F.3d 662, 667 (7th Cir. 2005).

### A.  The Taped Conversations

Schalk first challenges the district court's admission of the taped conversations between Meneghetti and Sowers

and between Sowers and Schalk. Schalk contends that in both sets of audio recordings, one of the participants in the conversation was no longer a co-conspirator (having become a government informant), and therefore the conversations were not had "in the course and in further-ance of the conspiracy." Schalk also claims that the statements made by the co-conspirator during those recorded conversations amounted to nothing more than "idle chatter," which did not seek to further the con-spiracy, as required for admission. Schalk also contends that any useful information elicited from these recordings was stated by the informant and is inadmissible.

In order for a statement made by a member of a conspir-acy to be admissible against other members of the conspir-acy under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were mem-bers of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspir-acy. *United States v. Powers*, 75 F.3d 335, 339 (7th Cir. 1996) (citing *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995)). A government informant's statements are not admissible under Rule 801(d)(2)(E) because he cannot be a conspirator; however, they are admissible if they provide context or were adopted by the conspirator during the course of the conversation. *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002); *United States v. Gajo*, 290 F.3d 922, 930-31 (7th Cir. 2002).

### 1. Conversations Between Meneghetti and Sowers

As noted above, Schalk argues that the statements recorded during Meneghetti and Sowers's conversations were not in furtherance of the conspiracy. We disagree. During those conversations, Meneghetti and Sowers

discussed Sowers's plans to meet with an unnamed man, the possibility of having to meet that man halfway, and Sowers's intentions to get the cocaine to Meneghetti as quickly as possible so that Meneghetti could pay off his debt to Sowers. During the January 24, 2005 conversations, Sowers asked if Meneghetti had anyone that wanted to buy the cocaine right now with money up front, and how much money Meneghetti could get to Sowers that week. They also talked about Schalk leaving town and Sowers's plans to meet him to stock up while he was gone. These statements are not "idle chatter," but are discussions about supply, demand, transportation, and finances directly related to and in furtherance of the drug conspiracy. *See, e.g.*, *United States v. Powers*, 75 F.3d 335, 339 (7th Cir. 1996) (discussions about directions to pick up drugs or money to pay for drugs were necessary for the actual conspiracy to distribute drugs, and thus were "in furtherance of the conspiracy"); *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995) (statements made to keep others informed of or confident in the alleged conspiracy "further the conspiracy").

Schalk also argues that he and Meneghetti never had an agreement to distribute cocaine. This argument is irrelevant because Meneghetti's statements were not admitted as those of a co-conspirator under Rule 801(d)(2)(E). Meneghetti's statements, as a government informant during these conversations, were not admissible for their truth, but were admissible for the context they provided for Sowers's statements. Meneghetti's statements were thus properly admitted.

Next, Schalk appears to argue that Sowers's statements to Meneghetti are inadmissible hearsay because "Sowers became an informant shortly after Meneghetti recorded him." This argument is not only frivolous, but in fact acknowledges that Sowers was still a party to the drug distribution conspiracy at the time of his conversa-

tions with Meneghetti, as further evidenced by Schalk's distribution of eleven ounces of cocaine to Sowers two days after the last conversation taped by Meneghetti. The district court did not abuse its discretion in admitting the recorded conversations between Meneghetti and Sowers.

### 2.   Conversations Between Sowers and Schalk

Schalk presents the same arguments as above in his contention that the taped conversations between Sowers and Schalk were improperly admitted. During those conversations, Schalk sought to further the conspiracy in several ways: (1) Sowers paid Schalk for drugs he had already received; (2) they discussed debts owed by Sowers for drugs fronted by Schalk; (3) they discussed traveling "up" because Schalk had "some put away," to which Sowers declined to make the trip for such a small quantity of drugs; and (4) they explicitly discussed the three-page contents of the drug ledger kept by Schalk and the need for accuracy of those numbers. These were all discussions to keep the drug trafficking operation afloat. The district court did not abuse its discretion by allowing the recorded conversations between Sowers and Schalk into evidence.

### B.   Sowers's Drug Ledgers

Schalk argues that the district court erred by admitting Sowers's notebooks containing his drug ledgers into evidence; he asserts that the ledgers are inadmissible hearsay and are not admissible under any hearsay exception. This is a different objection than was raised in his motion *in limine*, where Schalk argued that the ledgers were irrelevant and unfairly prejudicial.

A definitive, unconditional ruling *in limine* preserves an issue for appellate review, without the need for later objection. *Wilson v. Williams*, 182 F.3d 562, 563 (7th Cir. 1999) (en banc). A litigant who loses an evidentiary ruling and then offers the evidence himself does not waive the established objection for purposes of appeal. *Id.* at 567 (overruling *United States v. York*, 933 F.2d 1343 (7th Cir. 1991), to the extent it holds that an objection at trial is invariably required to preserve arguments for appeal that were fully presented to the district court before trial). However, Rule 103(a)(1) of the Federal Rules of Evidence requires litigants to state a specific ground for an objection to evidence, and "[g]rounds not presented cannot be raised later, else both judge and adversary are sandbagged (and preventable errors occur)." *Id.* In other words, "[t]he specific ground for reversal of an evidentiary ruling on appeal must also be the same as that [previously] raised." *United States v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007) (quoting *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988)). If no objection was made that would put the district court (and the other party) on notice of the objecting party's concern, then the standard of review is for plain error. *See Swan*, 486 F.3d at 264; *Wynn*, 845 F.2d at 1442.

Although the parties appear to agree that the standard of review for this evidentiary ruling is abuse of discretion, they are both mistaken. In his motion *in limine*, Schalk objected to the admission of Sowers's drug ledgers as irrelevant and more prejudicial than probative. The district court definitively denied Schalk's motion without any notice or consideration of Schalk's now-present hearsay concern. At trial, Schalk himself moved the ledgers into evidence. While this did not affect his appeal, his new grounds for objection to the ledgers does. Because Schalk now challenges the district court's evidentiary ruling on completely new grounds, we review this

challenge for plain error only. On appeal, Schalk makes no argument that the district court improperly found the ledgers to be relevant and probative, therefore we need not review that determination.

Under plain error review, an error must be "clear or obvious" and "affect substantial rights" in order to warrant reversing the district court's decision to admit the evidence. *Swan*, 486 F.3d at 264; *United States v. Sumner*, 265 F.3d 532, 539 (7th Cir. 2001). This Court will not correct any error unless it "seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Swan*, 486 F.3d at 264 (quoting *United States v. Kibler*, 279 F.3d 511, 514 (7th Cir. 2002)).

To determine if plain error existed, we must decipher if the evidence should have been excluded, and if the failure to exclude such evidence seriously affected the outcome of the case. Neither seems to be the case here. Documents that can be considered "tools of the drug trade" constitute statements made during the course and in furtherance of the conspiracy. *United States v. Thornton*, 197 F.3d 241, 251 (7th Cir. 1999); *see United States v. Nava-Salazar*, 30 F.3d 788, 798 (7th Cir. 1994); *United States v. De Gudino*, 722 F.2d 1351, 1356 (7th Cir. 1983). Sowers's drug ledgers constitute admissions by a co-conspirator of Schalk. The ledgers were made and kept by Sowers while he and Schalk were still engaged in the conspiracy. Therefore, the ledgers were admissible. Even if Sowers's ledgers had been excluded from evidence, the remaining evidence, including the recorded conversations and Meneghetti and Sowers's testimony at trial, was enough to establish beyond a reasonable doubt that Schalk was involved in a conspiracy to distribute cocaine. We therefore find no plain error.

### C. Jury Finding that Schalk Conspired to Distribute At Least Five Kilograms of Cocaine

Schalk's last argument asserts that the evidence presented at trial was insufficient to prove that Schalk conspired to distribute at least five kilograms of cocaine, as required to be guilty of violating 21 U.S.C. § 841(b)(1)(A). Schalk asserts that the drug ledgers accounted for only 4.65 kilograms of cocaine distributed to Sowers, and the evidence was insufficient to warrant a finding of more than that. As Judge Evans stated: "Prevailing on a sufficiency of the evidence challenge is as unlikely as hearing the song of a warbler on a central Chicago street in February, with or without the aid of a bionic ear." *Thornton*, 197 F.3d at 253. This Court will reverse a jury's finding on an essential element of a crime only if no rational trier of fact could have reached the same conclusion beyond a reasonable doubt. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003). In making that determination, the Court must view the evidence in the light most favorable to the government. *United States v. Grier*, 866 F.2d 908, 922 (7th Cir. 1989).

The jury heard a variety of evidence at trial. Sowers testified that Schalk delivered cocaine to him once every two weeks, except for a one month gap, from August 2003 until Sowers's arrest on January 26, 2005. That calculation yields approximately thirty-six two-week periods that Schalk provided Sowers with cocaine. Sowers also testified that he received between nine and eighteen ounces of cocaine each time, with the exception of receiving two ounces once and twenty-two ounces once. That calculation ((34 x 9) + 2 + 22) brings us to a total of 330 ounces of cocaine from Schalk to Sowers. Using the customary conversion factor of 35.27 ounces per kilogram, this evidence showed that Schalk distributed more than nine kilograms of cocaine to Sowers. The jury additionally had the drug ledgers to consider. As Sowers testified, he and Schalk only maintained numbers in those notebooks

for the outstanding debts remaining from their transactions, meaning they destroyed the records of drug transactions for which no debt was still owed. Based on all of this evidence, the jury reasonably concluded that Schalk conspired to distribute five or more kilograms of cocaine.

### III.  Conclusion

For the reasons stated herein, we AFFIRM the conviction and sentencing of Schalk.

A true Copy:

       Teste:

                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*