In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 06-3681

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAFAL WANTUCH,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 165—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED JANUARY 25, 2008—DECIDED MAY 1, 2008

———————

Before BAUER, WOOD and EVANS, *Circuit Judges.*

BAUER, *Circuit Judge.* Rafal Wantuch was indicted on charges of conspiracy to defraud the United States, bribery of a public official, fraudulent receipt of temporary Alien Registration Stamps, and making false statements to the (now defunct) Immigration and Naturalization Service ("INS"). Much of the evidence admitted at trial consisted of various recorded conversations between Wantuch and a cooperating witness, his co-conspirators, and undercover officers, from March of 1999 to October of 2000. A jury convicted Wantuch on all four counts. The district court sentenced Wantuch to 63 months' imprison-

ment on each count, to be served concurrently. Wantuch appeals, challenging various evidentiary rulings by the district court and the jury instructions. We affirm.

## I. Background

In 1998, the FBI, INS and Social Security Administration initiated a joint investigation called "Operation Golden Schemes," which focused on the criminal activities within Chicago's Eastern European community, particularly the marketing of fraudulent immigration documents. The FBI opened an undercover travel agency called G.S. Golden Travel ("GSGT"), located in a small two-story building on Belmont Avenue in Chicago. GSGT had a sign on the door that read "By appointment only," and was wired for audio and video surveillance. The FBI monitored GSGT from an adjacent storefront, and enlisted the services of several individuals: cooperating witness Gregory Sienkiewicz, a convicted felon with important connections within the eastern European Chicago community; undercover INS official Clarence Robinson, posing as a corrupt INS official who sold authentic green cards to illegal immigrants in exchange for bribes; Tommy Stevens, another undercover INS official who assisted clients in obtaining fingerprints for the green card applications; and (among others) FBI agents Michael Rogers and Robert Kowalski, who conducted surveillance at GSGT.

As part of the investigation, Sienkiewicz spread the word (with the help of official business cards) throughout the criminal community that he had plenty of financial resources to spend on contraband and stolen goods, and that he was running an illegal green card operation

out of GSGT. (The business card was less explicit about the illegal aspects of the business). The cover story was that Sienkiewicz made an INS connection while he was in prison, which led him to partner with a crooked INS official (Robinson) who was willing to accept a bribe of $5,000 in order to issue green cards to illegal immigrants.

After word got out in the community about GSGT, "brokers" began contacting Sienkiewicz, seeking green cards for their illegal immigrant "clients" in Chicago. Brokers and their clients would make appointments at GSGT, bringing with them identification, fingerprints (obtained from Tommy Stevens) and medical examination records. Sienkiewicz acted as a liaison between the brokers and Robinson, and took a portion of the payments that the brokers received from their clients. Sienkiewicz would take them to Robinson's office, where Robinson would conduct an interview and pretend to sell green cards. He instructed the client to make false representations on INS forms, namely that the client was being sponsored by an immediate family member who was a United States citizen, and to state that the interview was not conducted at GSGT, but at the INS office at 10 West Jackson, in downtown Chicago. At the end of the interview, he placed an official INS I-551 stamp on each client's passport.

In March of 1999, the FBI received information that a man had thirty boxes of contraband cigarettes for sale, and he was looking for a buyer. Sienkiewicz met the seller, who turned out to be Wantuch, at a building in northwest Chicago. (Wantuch, a native of Poland, legally obtained a green card when he came to the United States in 1993.) Wantuch offered to sell the cigarettes for $15,000. Wantuch and Sienkiewicz went back to GSGT where

Sienkiewicz gave Wantuch the cash. Wantuch told Sienkiewicz that he had "other merchandise," if Sienkiewicz needed anything, and that Wantuch would call him to conduct business in the future.

On May 19, 1999, Wantuch sold another box of contraband cigarettes to Sienkiewicz for $250. Wantuch also offered to sell Sienkiewicz stolen cars, liquor and other hot merchandise. Wantuch lamented that he was broke and needed to make more money, and asked Sienkiewicz if he needed or wanted anything. The discussion turned to green cards, and Wantuch lowered his voice and inquired about whether there were "bugs." He discussed the possibility of working with Sienkiewicz to bring in clients to obtain green cards. They talked about details, confirming that Sienkiewicz's "partner" Robinson required $5,000 and Sienkiewicz would receive fifty percent of the profits. Wantuch said that he already had a client lined up who would pay $12,000 for a green card.

Wantuch soon became quite the successful broker, acquiring as many as fourteen clients from July of 1999 to April of 2000, to purchase green cards.[1] He charged his clients between $5,000 to $13,000 in cash, above and beyond the $5,000 bribe paid to Robinson. Wantuch attended the interviews with his clients at GSGT, where Robinson gave blank INS forms to Wantuch's clients, instructed them to falsely claim that they were sponsored by immediate family members who were United States citizens and told them that they were already approved by the INS. During these interviews (caught on

---

[1] Wantuch's clients paid a total of $70,000 in bribes to Robinson. Wantuch paid Sienkiewicz a total of $14,500 in "kickbacks."

videotape by the FBI), Wantuch assisted in coaching his clients to make the false representations.

Jurgita Savickiene was one of Wantuch's clients. She and her sister, Lina, were illegal immigrants from Lithuania. In October of 1999, they heard about Wantuch's INS connection, and went to Wantuch's apartment to fill out the paperwork. Jurgita asked Wantuch how the process worked, and Wantuch explained to her that she would have to obtain fingerprints, a medical examination, and go to GSGT to meet the immigration officer who would place a stamp on her passport. Wantuch told Jurgita that it did not matter what her actual immigration status was, and that she was "pretty much safe." Jurgita said she would think about it, and Wantuch responded that the "immigration guy" would be raising his prices. Jurgita eventually agreed to pay Wantuch for a green card. She went to Wantuch's apartment on November 3, 1999, to fill out the paperwork, and they agreed on a price of $13,000. Jurgita gave Wantuch $3,000 as a down payment. Wantuch later called her to say he had made an appointment for her at GSGT and to bring the remaining $10,000 in cash with her.

On December 13, 1999, Wantuch and Jurgita arrived at GSGT with the paperwork. Jurgita testified that she knew that the travel agency was not an INS facility. During the meeting, in which Sienkiewicz was present, Wantuch, Jurgita, and Robinson went over her paperwork. Robinson told her that if she was ever asked, to say that her sister was a U.S. citizen and her immigration interview was conducted downtown at the INS office. Wantuch agreed, and also told her, "Just don't worry about anything, just go to the line for the U.S. citizens in the airport . . . just don't go to the visitor's . . . everything is going to be in

the computer." Robinson stamped her passport. Wantuch took the cash from Jurgita, gave $5,000 to Robinson and $2,000 to Sienkiewicz, and placed the remainder of the cash in his sock.

Gregorz Gudanowski, an illegal immigrant from Poland, was Wantuch's fourteenth and final client. Gudanowski was introduced to Wantuch by a friend, and met with him in February of 2000 to discuss Gudanowski's immigration problems.[2] Wantuch told Gudanowski that he could get a green card in six months for $20,000. Gudanowski thought the price was too high. Wantuch lowered his price to $16,000, and Gudanowski agreed to pay. On March 10, 2000, Gudanowski met Wantuch at the INS fingerprint office where Tommy Stevens worked, and gave Wantuch a down payment of $2,000. Wantuch set up an appointment at GSGT on April 19, 2000, and instructed Gudanowski to bring $10,000 cash, his paperwork, and passport. During the meeting in Robinson's office, Robinson stamped Gudanowski's passport and told him that, if anyone asked, he was interviewed at the INS office on Jackson. Wantuch told Gudanowski that "in case anyone ever asks you, you were at . . . West Jackson . . . downtown, Chicago. That's where you got this stamp." Wantuch told Robinson

---

[2] Gudanowski had exhausted all legal means to obtain documents. In 1994, he hired an attorney and attempted to obtain employer sponsorship, but his efforts failed. He voluntarily left the United States in 1999, and returned illegally in January of 2000. When he was told by an attorney that it would cost $6,000 and take about five or six years to obtain a green card, he sought other, faster ways to obtain a green card. Enter: Wantuch.

that Gudanowski did not have any relatives in the United States, to which Robinson responded, "Yes you do . . . you're his brother" and gestured to Wantuch. Wantuch agreed, stating "yeah, ok" and "in case anyone asks you, then say brother." Sienkiewicz told Wantuch to explain everything to Gudanowski later, to which Wantuch responded, "yeah." Gudanowski placed $10,000 on the chair and left. Wantuch paid Robinson $5,000, Sienkiewicz $2,500, and pocketed the remaining $2,500. Gudanowski never received his green card, and in 2003, he received a notice of deportation from the INS.

In mid-2000, Wantuch attempted to contact Sienkiewicz, who did not return Wantuch's phone calls for two months. They finally spoke on September 9, 2000. In a recorded conversation, Wantuch anxiously told Sienkiewicz that he had procured many new clients, some of whom already gave him a down payment for green cards. Sienkiewicz told Wantuch that he had put the INS business on hold, and to stop contacting Tommy Stevens. Wantuch promised to stop, explaining that he only contacted Stevens because he had not heard from Sienkiewicz.

In October of 2000, the FBI recorded a meeting with Wantuch and Robinson at GSGT. Wantuch complained that he could not reach Robinson since the business had slowed down, and he told Robinson that he had six more clients. Robinson explained that the INS was conducting an audit, but he was still in business, just taking things slowly. Robinson told Wantuch that "we don't want nobody goin' to jail." Wantuch responded, "Of course!"

On February 17, 2005, Wantuch was charged in a four count indictment: (1) conspiracy to defraud the United States in violation of 18 U.S.C. § 371; (2) bribery of a public

official in violation of 18 U.S.C. § 201(b)(1)(A) and (2); (3) fraudulent receipt of temporary alien registration stamps, in violation of 18 U.S.C. § 1546; and (4) making false statements to the INS, in violation of 18 U.S.C. § 1001 (a)(2) and (2).

The government's theory was that between March of 1999 and April of 2000, Wantuch conspired with Gudanowski and his other "clients" to defraud the government by obtaining temporary green card stamps through bribes to an INS officer and false statements on green card applications. Prior to trial, the government submitted a written *Santiago*[3] proffer, which set forth the facts supporting the admission of relevant portions of the tape recorded conversations from 1999 to 2000 depicting Wantuch's involvement in Operation Golden Schemes, pursuant to the Federal Rule of Evidence 801(d)(2)(E). Wantuch filed no objections.

At trial, the aforementioned facts were introduced through nine witnesses called by the government, including Sienkiewicz, Robinson, Jurgita, and Gudanowski. The

---

[3] Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the statements of unindicted coconspirators are admissible as non-hearsay if the government proves prior to trial that a conspiracy existed, that the defendant and the declarant were members of the conspiracy, and that the statements were made during the course and in furtherance of the conspiracy. The admissibility of the coconspirator statements is subject to the trial court's "later determination that the government proved these foundational elements at trial." *United States v. Blanding*, 53 F.3d 773, 777 (7th Cir. 1995).

government also successfully moved to admit into evidence the audio and video taped conversations involving Wantuch, recorded on March 17, 1999, May 19, 1999, September 22, 1999, December 13, 1999, April 19, 2000, September 9, 2000, and October 4, 2000.

Wantuch testified in his own defense. He denied any wrongdoing, claiming that Sienkiewicz hired him to work for GSGT as an interpreter and office helper, and that Sienkiewicz told him that the INS wanted to sell immigration benefits on the black market in order to raise funds for the modernization of its computers for Y2K. Wantuch denied he was committing a crime during the March 17, 1999 and May 19, 1999 cigarette transactions, claiming he was moving the cigarettes for a friend. He also denied that he offered to get or sell Sienkiewicz guns or other stolen merchandise. He was shown video footage of the meetings at GSGT with his "clients" and Robinson, and admitted that he instructed and encouraged his clients to lie about having a United States citizen relative as green card sponsors, and to lie about having received their I-551 stamps at 10 West Jackson. However, Wantuch claimed that he only told his clients to lie because Sienkiewicz and Robinson told him to do so.

When asked about the payment of money on the video between Wantuch, Robinson and Sienkiewicz, Wantuch claimed that he was merely acting as a go-between for his clients. He denied making payoffs to Sienkiewicz, and said Sienkiewicz was actually paying Wantuch, since he was on the payroll at the office. He also admitted that he knew the proper location to obtain a green card was 10 West Jackson, and not GSGT, as he went through the application process and obtained a legal green card in 1993 when he immigrated to the

United States. He also testified that he paid much less than $16,000—the amount he charged Gudanowski—to legally obtain his green card.

A jury convicted Wantuch on all four counts of the indictment. Wantuch was sentenced to 63 months' imprisonment on each count, to be served concurrently. This timely appeal followed.

## II. Discussion

Wantuch raises four issues on appeal that we will address: (1) whether the district court erred by allowing Sienkiewicz and Robinson to testify as to their opinion of Wantuch's intent under Federal Rule of Evidence 701; (2) whether the court erred in admitting testimony about a confrontation between Gudanowski and Wantuch in 2003; (3) whether the court erred in admitting evidence of the cigarette sales between Wantuch and Sienkiewicz; and (4) whether the evidence of a conspiracy was sufficient to warrant a *Pinkerton* instruction.[4] We address each argument in turn.

### A. Opinion Testimony

At trial, Sienkiewicz testified about Wantuch's role in the green card scheme, including Wantuch's acquisition of fourteen clients, and a total of $70,000 paid to Robinson in exchange for the green cards. The jurors were presented

---

[4] Wantuch makes other arguments pertaining to the adequacy of the jury instructions. We have considered all of his challenges and have found them to be without merit.

with audio and video recordings of all of the conversations between Wantuch and Sienkiewicz from March of 1999 to September of 2000. Near the end of his testimony, the government asked:

> Q: Mr. Sienkiewicz, at all times that you were dealing with Wantuch, was he aware that paying [Robinson] those $5,000 in exchange for the green cards was illegal?

Defense counsel objected, and after the court heard arguments from both sides on whether to allow the opinion testimony at a sidebar, the court overruled the objection and Sienkiewicz answered:

> A: I think we must be kidding here. This gentleman knew all the time that everything that he was doing was illegal. One does not buy a green card on the street for money. Come on, let's stop pretending here. We are not little people, are we?

Robinson also testified about his dealings with Wantuch and the clients that Wantuch brought into GSGT. The government played the video recording from December 13, 1999, the day that Wantuch brought Jurgita into GSGT for an interview. After the jury watched the video, the government handed Robinson a transcript of the recording:

> Q: I want to refer you to line 37, still on page 6. Did Wantuch say "If somebody asked you?"
>
> A: Yes.
>
> Q: And in response to that, you said: "If anybody asked you, because when you're in our airports, sometimes they ask you, you know, and you come to the U.S. citizen's line."
>
> A: Yes.

Q: What was your understanding of what Wantuch
    was doing during that conversation?

A: He was saying that—telling her that she did have
    a sister . . . that petitioned for her.

Defense counsel objected after Robinson answered,
stating "the words speak for themselves." The court asked
the government to repeat the question, but the govern-
ment moved on to another line of questioning. Later, the
government asked Robinson:

Q: Some of the procedures in the interview that we
    watched on that video were the same as some
    of the procedures that are followed legitimately at
    10 West Jackson, correct?

A: Yes they [were].

Q: Now, when you use the word "legitimate," is it
    your understanding that the brokers, specifically
    Wantuch, understood that this was a legitimate
    transaction?

A: No he did not.

Defense counsel failed to object to this testimony.

Wantuch argues that Sienkiewicz and Robinson's testi-
mony as to Wantuch's state of mind should have been
excluded because it was not rationally based on their
perception of Wantuch, and their testimony was neither
helpful to the jury nor necessary for the jury's review of
the evidence, under Federal Rule of Evidence 701. He also
argues that the unfair prejudice of the testimony vastly
outweighed any probative value it had under Rule 403.

We have held that lay opinion testimony regarding
mental states is admissible under Rule 701. *United States v.*

*Bogan*, 267 F.3d 614, 619 (7th Cir. 2001); *United States v. Guzzino*, 810 F.2d 687, 699 (7th Cir. 1987); *Bohannon v. Pegelow*, 652 F.2d 729, 732 (7th Cir. 1981). However, there are limits to its admissibility. Rule 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions of inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

*See also* Fed. R. Evid. 704(a) ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). The considerations outlined in Rule 403 also apply—lay opinions may be excluded if the opinion would be a waste of time or its probative value is substantially outweighed by its prejudicial nature. *Bohannon*, 652 F.2d at 732; Fed. R. Evid. 704 Advisory Committee Note on 1972 Proposed Rules.

Rule 701(a)'s requirement that the opinion be rationally based on the witness's perception is "the familiar requirement of first-hand knowledge or observation." Rule 701(a) Advisory Committee Note; *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Rule 701(b) assures against the admission of opinions which would merely tell the jury what result to reach. Fed. R. Evid. 704 Advisory Committee Note on 1972 Proposed Rules. Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying. *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

A decision to admit lay opinion testimony is committed to the district court's discretion and is reversed only for abuse of that discretion. *United States v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994); *United States v. Stormer*, 938 F.2d 759, 761 (7th Cir. 1991). A determination made by a trial judge regarding the admissibility of evidence is treated with great deference because of the trial judge's first hand exposure to the witnesses and the evidence as a whole, and because of her familiarity with the case and ability to gauge the likely impact of the evidence in the context to the entire proceeding. *Bogan*, 267 F.3d at 619. Further, even erroneous evidentiary rulings will not be overturned if any resulting error was harmless. *United States v. Chavis*, 429 F.3d 662, 667 (7th Cir. 2005). With those standards in mind, we turn first to Wantuch's argument that the admission of Sienkiewicz's testimony violated Rule 701.

Because Wantuch properly objected to Sienkiewicz's testimony, we review the portion of his testimony for an abuse of discretion. The evidence sufficiently demonstrated that Sienkiewicz's opinion testimony was rationally based on his perception. Prior to Sienkiewicz's comment that Wantuch was aware his conduct was "illegal," the government elicited testimony from Sienkiewicz about his interactions with Wantuch from March of 1999 to September of 2000. Sienkiewicz was deeply involved in the green card scheme; he was Wantuch's contact every step of the way. Sienkiewicz testified about his initial meetings with Wantuch in March and May of 1999, in which Wantuch sold Sienkiewicz contraband cigarettes, and discussed details of the scheme to obtain green cards in exchange for paying bribes to an INS official. Sienkiewicz was present at the meetings with Robinson, Wantuch, and

Wantuch's clients and observed Wantuch coach his clients to make false statements on the INS forms and to make further false statements if they were ever questioned by INS officials. Sienkiewicz also observed Wantuch accept money from his clients, hand over payments to Robinson in exchange for stamping his clients' passports, and share the profits with Sienkiewicz. Therefore we find that Sienkiewicz's opinion testimony about Wantuch's knowledge of the illegality of his actions was rationally based on his perception. *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) ("Lay opinion testimony regarding a defendant's knowledge will, in most cases, only satisfy the rationally-based requirement if the witness has personal knowledge of one or more objective factual bases from which it is possible to infer with some confidence that a person knows a given fact . . . includ[ing] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were.") (internal quotations omitted).

But this testimony was unhelpful to the jury under Rule 701(b). Attempts to introduce meaningless assertions which amount to little more than choosing up sides require exclusion for lack of helpfulness by Rule 701. Rule 701(b) Advisory Committee Note on 1972 Proposed Rules. The question posed to Sienkiewicz to opine as to Wantuch's knowledge of whether his actions were "legal," demanded a conclusion as to the legality of Wantuch's conduct, which is unhelpful to the jury under Rule 701. *See United States v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994) (finding that the question posed to a defendant, "you're admitting to a conspiracy, aren't you," was unhelpful testimony under Rule 701); *United States v. Baskes*, 649

F.2d 471, 478 (7th Cir. 1980) (when a witness is asked whether the conduct in issue was "unlawful" or "willful" or whether the defendants "conspired," terms that demand an understanding of the nature and scope of the criminal law, the trial court may properly conclude that any response would not be helpful to the trier of fact under Rule 701(b)).

We note that the question posed by the government was unnecessary, in light of all of the evidence against Wantuch that the government presented through Sienkiewicz's testimony. The jury was just as capable as Sienkiewicz of inferring that Wantuch knew he was committing a crime, without Sienkiewicz opining as to whether Wantuch was aware that his conduct was illegal. *See Rea*, 958 F.2d at 1216.

Nevertheless, reversal, the relief which Wantuch seeks, is not required where the error is harmless. Fed. R. Crim. Pro. 52(a). We see no reasonable possibility that Sienkiewicz's statement had a substantial and injurious effect or influence on the jury's verdict, *United States v. Douglas*, 408 F.3d 922, 929 (7th Cir. 2005), in light of the overwhelming evidence presented against Wantuch, including video and audio tapes of seven different encounters in which Wantuch could be seen or heard participating in illegal activity, interlocking testimony of nine government witnesses, and Wantuch's own admissions. When viewed in the context of the entire trial and the totality of the evidence, the jury heard substantial evidence to support the government's theory at trial, and although the district court erred in admitting Sienkiewicz's statement, the error was harmless.

Wantuch makes the same arguments under Rule 701 regarding the admission of Robinson's testimony. Because

Wantuch failed to contemporaneously object (or state specific grounds for his objections) to any of Robinson's testimony of which he now complains, we review Robinson's testimony for plain error. *See* Fed. R. Evid. 103(a)(1); *United States v. Swan*, 486 F.3d 260, 263 (7th Cir. 2007). Under plain error review, an error must be "clear or obvious" and "affect substantial rights" in order to warrant reversing the district court's decision to admit the evidence. *United States v. Schalk*, 515 F.3d 768, 776 (7th Cir. 2008) (citation omitted). We will not correct any error unless it "seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Id*. at 777 (citations omitted).

The district court did not plainly err in admitting the testimony of Robinson. In short, under Rule 701, Robinson had sufficient first-hand knowledge of the conversation with Wantuch and Jurgita, that was based on his direct participation, as well as his perception and observation of Wantuch. The jurors were presented with the entire video-recorded conversation between Robinson and Wantuch on December 13, 1999. Robinson specifically told Wantuch's clients to lie on the INS forms, and he observed Wantuch assist him in coaching his clients to make false representations. *See United States v. Estrada*, 39 F.3d 772, 773 (7th Cir. 1994) (per curiam) (holding that a participant in a conversation may testify as to his understanding of the conversation to satisfy Rule 701(a)'s requirement that the testimony be rationally based on the witness's perceptions); *United States v. Lizardo*, 445 F.3d 73, 83 (1st Cir. 2006) (holding that a witness may testify about his subjective interpretation of a conversation in which he is participating as long as his opinion is rationally based on his perception and is helpful either to

an understanding of his testimony or to the determination of a fact in issue).

Unlike Sienkiewicz's testimony, Robinson did not comment on the illegality of Wantuch's actions. He merely testified to what he understood Wantuch's comments to mean—and repeated what Wantuch told Jurgita—that if she was ever questioned by the INS, she was to say that she had a sister who was a legal U.S. citizen who petitioned for her. Such testimony also could prove helpful to a jury to interpret what Wantuch and Robinson were communicating to Jurgita during the meeting. Furthermore, even if Wantuch was correct, the overwhelming weight of the case against him makes it clear that these alleged errors did not affect the outcome of the proceedings such that we should consider invoking our discretion under Fed. R. Crim. Pro. 52(a). *United States v. Jumah*, 493 F.3d 868, 875 (7th Cir. 2007) (citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1170, 123 L.Ed.2d 508 (1993)).

### B.   Gudanowski's Confrontation with Wantuch in 2003

Near the end of his testimony, Gudanowski stated that in 2003, after he received a deportation letter from the INS, he confronted Wantuch at a local tavern. The following colloquy took place between the government and Gudanowski:

Q: What happened once you got to [the tavern]?

A: Well, when I got there, he was sitting there and he was kind of very thin, unbalanced, and when I saw him, I was—basically, all my anger went away. And I asked him why he did this to me, he knew that it was illegal, and, you know, he was

> like on strong medication or something, and then he even offered me his own green card.
>
> Q: Now when you approached Mr. Wantuch and told him this, including why did he do this, what did he say in response?
>
> . . .
>
> A: He didn't basically give me a sensible answer. He was basically sitting there kind of looking guilty, and that was about it.

Defense counsel moved to strike the term "guilty," and the district court sustained the motion and instructed the jury accordingly.

Wantuch sees error in the admission of Gudanowski's description of his confrontation with Wantuch in 2003, which he characterizes as post-conspiracy statements that were irrelevant and prejudicial. Wantuch failed to object to the admission of this evidence at trial, therefore we review for plain error. *United States v. Powers*, 75 F.3d 335, 338 (7th Cir. 1996).

Because Wantuch has presented no evidence to convince us otherwise, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction, and disregarded Gudanowski's use of the term "guilty." *United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007). Errors that are the subject of corrective instructions to the jury are presumed harmless. *United States v. Moore*, 115 F.3d 1348, 1358 (7th Cir. 1998); *see also Greer v. Miller,* 483 U.S. 756, 766 n.8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an

overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.").[5]

## C.  Introduction of Evidence of Cigarette Sales

Wantuch argues that the court erred in admitting (1) the evidence of the contraband cigarette sales between Wantuch and Sienkiewicz, and (2) the related conversations about other stolen merchandise. In Wantuch's view, the evidence does not prove an element of any of the charged offenses, and thus is not inextricably intertwined with the charged crimes.

---

[5]  Wantuch fails to develop his argument on the other aspects of Gudanowski's testimony, nor does he cite any substantive legal authority to support his contention. It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel. *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) (internal quotations omitted). Thus his argument is waived. *See Perez v. Illinois*, 488 F.3d 773, 776-77 (7th Cir. 2007); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments . . . are waived [on appeal]."). In any event, we find the admission, if error, to be harmless, failing to have "a substantial and injurious effect or influence on the jury's verdict.*" United States v. Thomas*, 86 F.3d 647, 655 (7th Cir. 1996). The government presented overwhelming evidence of Wantuch's guilt on the conspiracy and bribery charges, and did not attempt to use this portion of Gudanowski's testimony in its closing argument. Thus, we are convinced that any erroneous admission of this evidence did not affect the jury's ultimate decision.

Prior to trial, the government filed a motion in limine to introduce (1) evidence of Wantuch's sale of contraband cigarettes to Sienkiewicz, and (2) conversations between Sienkiewicz and Wantuch in May of 1999, in which Wantuch offered to sell Sienkiewicz other stolen merchandise. Wantuch filed a written objection to the introduction of the evidence of the cigarette sales. During a pretrial hearing, the district court held that evidence of the cigarette sales was admissible because it was "intrinsically connected with the case" (or intricately related), and therefore the court did not have to "deal with [the admissibility of the evidence] under Rule 404(b)." The government then asked the court for a ruling on the admissibility of the other conversations between Wantuch and Sienkiewicz about the stolen liquor and cars. The court gave Wantuch a few days to raise any objections, but Wantuch raised none. On the first day of trial, the government requested a ruling on the admissibility of the conversations related to the stolen merchandise. The court stated to Wantuch, "It doesn't sound like there's an issue," to which Wantuch responded, "No." Wantuch subsequently failed to raise any objections during trial.

First, we address Wantuch's argument regarding the admission of the evidence of other stolen merchandise. The district court gave Wantuch a number of days to file any objections, which Wantuch failed to do. The court also directed a question to Wantuch, giving him another chance to object to the evidence, but Wantuch affirmatively stated on the record that he had no objection to the admission of this evidence of other stolen merchandise. Therefore we find that Wantuch waived his objections to this evidence, and we decline to review the district court's decision. *United States v. Murry*, 395 F.3d 712, 718-19 (7th Cir. 2005).

Next, we turn to the admission of the evidence of the contraband cigarette sales. The district court admitted this evidence solely under the theory that it was intricately related to the conspiracy. This court has a well-established line of precedent that allows evidence of uncharged acts to be introduced at trial if the evidence is "intricately related" to the acts charged in the indictment. *Bogan*, 267 F.3d at 621. We review the district court's decision to admit the evidence of the contraband cigarette sales under the intricately related doctrine for an abuse of discretion. *United States v. Strong*, 485 F.3d 985, 989 (7th Cir. 2007). Under this doctrine, whether instances of uncharged conduct are "intricately-related" (or "inextricably intertwined") to the case at hand depends on whether "they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime." *United States v. Gougis*, 432 F.3d 735, 742 (7th Cir. 2005) (citation omitted). The admissibility of such evidence is limited only by the balancing test set forth in Rule 403 and does not implicate the character/propensity prohibition of Rule 404(b). *United States v. Griffin*, 493 F.3d 856, 867 (7th Cir. 2007); *McLee*, 436 F.3d at 760; *United States v. Ramirez*, 45 F.3d 1096, 1102-03 (7th Cir. 1995).

Wantuch contends that the discussion of illegal sales of cigarettes has nothing to do with immigration documents or elements of the charged offenses; however, uncharged criminal activity need not be identical to the charged crime in order to be admitted under the intricately related doctrine. *Gougis*, 432 F.3d at 743. Here, the evid-

ence of the sale of contraband cigarettes showed how Wantuch's relationship with Sienkiewicz "began, its basis and structure, and how the relationship blossomed into the charged conspiracy." *United States v. Zarnes*, 33 F.3d 1454, 1469 (7th Cir. 1994). It outlined how the relationship of trust and cooperation between Sienkiewicz and Wantuch was born, developed and eventually led to their respective roles in the conspiracy. *See United States v. Spaeni*, 60 F.3d 313, 316 (7th Cir. 1995); *see also United States v. Richmond*, 222 F.3d 414, 417 (7th Cir. 2000) (holding that evidence was intricately related because it explained the circumstances surrounding the relationships of the people involved in the conspiracy). Further, the evidence showed that Wantuch was a willing participant in the sale of illegal goods (and eventually the green card scheme), demonstrating that he was ready to pursue any avenue in order to make money by offering to provide Sienkiewicz with any merchandise that he required.

Wantuch argues that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Fed. R. Evid. 403. The district court's admission of evidence under Rule 403 is entitled to special deference. "Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge." *Strong*, 485 F.3d at 991 (citation omitted). Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented. *Id.* The evidence was probative to counter Wantuch's defense that he was simply hired by Sienkiewicz to work in the office at GSGT and help the INS by new computers for the Y2K, and that he did not commit a crime when he sold the contra-

band to Sienkiewicz. Additionally, to minimize the risk of unfair prejudice, the court ensured that the jury used the evidence only for a legitimate purpose—Wantuch's intent—when it gave a limiting instruction in the final jury instructions. *See United States v. Whitlow*, 381 F.3d 679, 686 (7th Cir. 2004). The evidence was properly admitted.

### D.  The *Pinkerton* Instruction

Wantuch further argues that the district court erred in giving the *Pinkerton*[6] instruction, because the evidence at trial was insufficient to support the conspiracy count. During the jury instruction conference, the government proposed the pattern *Pinkerton* instruction:

> A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offenses were committed and if the offenses were committed in furtherance of and as a foreseeable consequence of the conspiracy. Therefore, if you find the defendant guilty of the conspiracy charged in Count 1 of the indictment and if you find beyond a reasonable doubt that while he was a member of the conspiracy, his fellow conspirators committed the offenses in Count Two, Three, and Four in furtherance of or as a reasonable consequence of that conspiracy, then you should also find the defendant guilty of Counts Two, Three, and Four.

---

[6]  Under *Pinkerton*, a coconspirator may be held criminally liable for the foreseeable overt acts of others in furtherance of a conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000).

Because Wantuch makes this objection for the first time on appeal, we review the argument for plain error. *United States v. Matthews*, 505 F.3d 698, 709 (7th Cir. 2007); Fed. R. Crim. P. 52(b). "Defendants challenging the quantum of evidence supporting a jury verdict face a daunting task." *United States v. Wortman*, 488 F.3d 752, 754 (7th Cir. 2007). When we review the sufficiency of the evidence, we ask only if, after viewing all of the evidence in a light most favorable to the government, and drawing all reasonable inferences therefrom, a rational trier of fact could not have found the essential elements of the crime, beyond a reasonable doubt. *United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006).

To sustain a conviction for conspiracy under 18 U.S.C. § 371, the government must prove: (1) an agreement to commit an offense against the United States; (2) an overt act in furtherance of the conspiracy; and (3) knowledge of the conspiratorial purpose. *United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006). Wantuch argues that the evidence failed to show, beyond a reasonable doubt, any agreement between Wantuch and Gudanowski. The evidence proves otherwise. The nub of a conspiracy is an agreement, and the government can prove the agreement by showing "an understanding—explicit or implicit—among coconspirators to work together to commit the offense." *United States v. Bailey*, 510 F.3d 726, 735 (7th Cir. 2007). A jury is not limited to direct evidence and may find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn from the relationship of the parties, their overt acts, and the totality of their conduct. *United States v. Macedo*, 406 F.3d 778, 791-92 (7th Cir. 2005) (citation omitted). The record strongly supports the notion that Wantuch entered into

an agreement with Gudanowski to defraud the United States by any one of the substantive counts in the indictment. From the moment Gudanowski joined forces with Wantuch, he had exhausted his legal means of obtaining a green card, and his only hope for a speedy solution was to enlist Wantuch's services. Wantuch's actions as a broker constituted a continuing relationship with Gudanowski, based on the common purpose and agreement—to obtain green cards by paying bribes to an INS official. Gudanowski agreed to pay, and Wantuch agreed to facilitate appointments to undergo medical exams and obtain fingerprints, and to arrange meetings at GSGT with Robinson. The jury watched on video as Wantuch assisted Robinson in instructing Gudanowski to make false representations on the INS forms, such as claiming to have a relative who would sponsor him, and that if he was ever questioned, his interview took place at 10 West Jackson, and not at GSGT. On the stand, Gudanowski admitted that he lied on his application and that he knew GSGT was not an INS facility. Wantuch argues that Gudanowski's testimony proved that he lacked criminal intent, but credibility determinations are for the jury. *United States v. Williams*, 298 F.3d 688, 692 (7th Cir. 2002) (coconspirator's testimony sufficient to prove existence of a conspiracy). The jury was entitled to believe that Gudanowski was in cahoots with Wantuch to illegally obtain a green card, therefore we find that the evidence was sufficient to find that Wantuch participated in the charged conspiracy.

A *Pinkerton* instruction informs the jury that if they initially determine beyond a reasonable doubt that a conspiracy existed, and the defendant was a member of the conspiracy, then they may find him responsible for offenses committed by other coconspirators in the fur-

therance of the conspiracy. The evidence presented in this case sufficiently establishes Wantuch's participation in the conspiracy, therefore it was appropriate for the district court to give the jury a *Pinkerton* instruction.

## III. Conclusion

For the aforementioned reasons, the judgments of the district court are affirmed and the verdict against Wantuch stands.