74 F.3d 153
 Charles R. SPEARS, R.H. Farley, Inc., and Huxley, Inc. d/b/a
B-Line Taxi, Plaintiffs-Appellants,
v.
CITY OF INDIANAPOLIS, William H. Hudnut III, individually
and as mayor of the City of Indianapolis, Fred L. Armstrong,
individually and as controller of the City of Indianapolis,
and Gerald Young, individually and as a police sergeant of
the City of Indianapolis, Defendants-Appellees.
 No. 95-1565.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 27, 1995.
Decided Jan. 19, 1996.
 
 Curtis Edward Shirley, Cremer & Miller, Indianapolis, IN, and Stephen Laudig, Mark W. Rutherford, Linda George, and W. Russell Sipes (argued), Laudig, George, Rutherford & Sipes, Indianapolis, IN, for Plaintiffs-Appellants.
 Dale R. Simmons (argued), Office of the Corporation Counsel, City Counsel Legal Division, Indianapolis, IN, and John S. Beeman, Harrison & Moberly, Indianapolis, IN, for Defendants-Appellees.
 Before FLAUM, ROVNER, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 "What a diff'rence a day makes ... twenty-four little hours."
 
 
 2
 (Dinah Washington,[1] Circa Summer of 1959)
 
 
 3
 This case is about "what a difference a day makes ... twenty-four little hours" when responding to a motion for summary judgment. If Charles Spears and the other plaintiffs had twenty-four little hours more they might still be in the case. Without twenty-four little hours extra they definitely are out of court. And "that's the diff'rence a day makes."
 
 
 4
 Our case arises from Mr. Spears' mostly unsuccessful venture into the taxicab business in the city of Indianapolis during the 1980's. Spears and his two corporations, R.H. Farley, Inc. and Huxley, Inc. (we'll occasionally refer to everyone simply as Spears), brought the suit under 42 U.S.C. Sec. 1983--with some pendent state law claims tagging along--against the City, its mayor, and two city employees--the controller and a police sergeant. The district court entered summary judgment for the defendants and the plaintiffs appeal.
 
 
 5
 The primary argument on appeal is whether the district court abused its discretion when it denied Spears' request for one more day to fully respond to a defense motion for summary judgment. With something less than real enthusiasm, the plaintiffs also challenge the grant of summary judgment itself. Lastly, they contest a district court order that they pay costs associated with a discovery request. Because we find no abuse of discretion and no error, we affirm the district court in all respects. In order to appreciate why we find no abuse of discretion, we need to fully review the facts that led up to the court's decision. We'll start at the beginning, in the early 1980's.
 
 
 6
 R.H. Farley, Inc. and Huxley, Inc. were taxicab companies operating under the name of "B-Line Taxi" in Indianapolis from 1983 to 1989. Mr. Spears was the owner and sole stockholder of both companies. During the time Farley and Huxley were in business, William Hudnut was the mayor of Indianapolis, Fred Armstrong was the city's controller, and Gerald Young was a city police officer assigned to the controller's office. During the 1980's, the taxicab business in Indianapolis was regulated by an ordinance requiring that cabs be licensed, insured, inspected and put in service within 30 days after the license is issued.
 
 
 7
 Mr. Spears expressed interest in the taxicab business in 1981 when he visited the controller's office to research the availability of licenses. He was not able to apply for licenses at that time because new licenses are only issued during "open enrollment" periods. In 1983, Spears acquired five existing licenses by virtue of his ownership of Farley and Huxley. When an enrollment period finally opened in June 1984, Farley and Huxley each applied for 25 licenses. Each received 8, and 17 applications for each company were denied. Like every other taxicab company awarded licenses, Farley and Huxley were required to have their cabs on the street within 30 days of the license award. When they failed to field their cabs in time, the 16 licenses (8 each) were revoked. An appeal of this revocation order to the controller and to the License Review Board ("LRB") was available, but none was taken.
 
 
 8
 Six months after the licenses had been revoked, Farley and Huxley filed a complaint in the Superior Court of Marion County, Indiana, challenging the denial of 34 licenses applied for in June 1984. Spears and the City compromised the case by agreeing to a hearing before the controller to determine the status of the 34 licenses that were denied and the 16 that were revoked. Spears came up dry after the hearing however, as the controller ruled that the licenses were properly denied and revoked. This time Farley and Huxley appealed the controller's decision to the LRB. The LRB reinstated the 16 revoked licenses, but again with the requirement that Farley and Huxley have their cabs in service within 30 days. The time limit was not met, so the controller's office again revoked the 16 licenses.
 
 
 9
 The next enrollment period opened on December 1, 1986, and Farley and Huxley each applied for 25 licenses. Huxley was awarded 25; Farley none, because it was found not to be qualified under the city ordinance. On this occasion, Huxley (surprisingly) was able to field 25 taxi-cabs within the required 30 days. During the next enrollment period in June 1987, Farley and Huxley were each awarded 25 licenses. Over the course of the next three months, however, 21 licenses were revoked because the cabs either failed inspection or were found to be inoperable. After an appeal to the controller, the parties executed a settlement agreement whereby Farley and Huxley retained a total of 40 of the 50 licenses awarded to them.
 
 
 10
 Problems continued to plague Spears' businesses when 6 licenses (it may have been only 5, but we think 6 is correct) were revoked in March 1988 because cabs were not in service as required. An appeal was taken to the controller, who affirmed the revocations. Further appeal was taken to the LRB, which decided to review all of Farley and Huxley's licenses, a total of 40 at that time.
 
 
 11
 While the appeal we just mentioned was pending, Spears faced difficulties on another front. Indiana law requires that taxicab companies provide proof of financial responsibility by either an insurance policy, a certificate of self-insurance, or a deposit of money or securities. Ind.Admin.Code tit. 140, art. 1, r. 5 (1984). Farley and Huxley met this requirement when they obtained a certificate of self-insurance from the Indiana Bureau of Motor Vehicles (BMV) on December 18, 1987. On April 5, 1988, the BMV notified Farley and Huxley that their certificate of self-insurance was only valid for 1987 and that it needed to be renewed. Farley and Huxley renewed their application for a certificate of self-insurance, but it was denied by the BMV because they did not meet the minimum financial collateral requirement to be self-insured. They appealed this decision to the BMV, which scheduled the matter for a hearing. Meanwhile, the BMV also informed the controller's office that Farley and Huxley were not self-insured. The controller, Armstrong, immediately sent written notice to Farley and Huxley that they had 24 hours to correct the lack of insurance. He also warned them that failure to do so would lead to suspension and possible revocation of their remaining licenses.
 
 
 12
 Rather than provide proof of insurance, Farley and Huxley again sought relief in state court. On September 2, 1988, they obtained a temporary restraining order against the controller prohibiting revocation of the licenses based on their lack of self-insurance. Twenty-one days later, after the TRO expired, the controller's office revoked the licenses because Farley and Huxley had still failed to provide proof of insurance. After a hearing, in October 1988, the BMV upheld the decision denying Farley and Huxley self-insured status for 1988. Not to be denied, Farley and Huxley again sought declaratory relief from the state court. In November 1988 they won a preliminary injunction enjoining the controller from suspending or revoking their licenses based on their lack of self-insurance. The injunction was subsequently dissolved.
 
 
 13
 Eventually, in April 1989, the LRB held a hearing on the revocation of all of Farley and Huxley's 40 licenses. At this hearing, Farley and Huxley withdrew their appeal of the 34 licenses that were revoked for lack of insurance. The revocation was not contested further, and it is undisputed that Farley and Huxley failed to exhaust their administrative remedies with regard to these 34 licenses. Thereafter, the state court dissolved the preliminary injunction granted to Farley and Huxley with regard to the revoked 34 licenses. Farley and Huxley were not happy with this result so they tried to appeal, but they failed to perfect the appeal as required by Indiana law.
 
 
 14
 Thus, the LRB was left to consider the status of the 6 remaining licenses. The LRB upheld the revocation of the 6 licenses for failure to put the taxicabs in service, leaving Farley and Huxley with no licenses and no taxicabs on the street. Although Farley and Huxley filed a petition for judicial review of this revocation, it was dismissed for failure to prosecute.
 
 
 15
 Having struck out in his dealings with the controller, the LRB, and the state courts, Spears took his case to federal court in 1991. He filed a complaint seeking compensatory and punitive damages, alleging that the defendants violated his civil rights by conspiring to harass, threaten, and intimidate him in order to drive his companies out of the taxicab business in Indianapolis.
 
 
 16
 Following two years of swimming in the sea of discovery, the defendants filed a motion for summary judgment, with supporting documentation, on January 3, 1994. The filing of the motion triggered Local Rule 56.1 (S.D.Ind.), which gave Spears 15 days to file a responsive brief together with supporting documentation of his own. Less than a week before the deadline, Spears sought an extension of time to respond to the motion. The district court, over the defendants' objection, granted an extension until February 22, 1994. The extension gave Spears 34 more days to respond, but he didn't get in under the wire. Instead, Spears returned to court and asked for a second extension, citing for cause the intervening federal holiday (Presidents' Day) and the number of exhibits he wanted to file with his response. Again over the defendants' objection, the district court gave Spears more time. The new due date was March 1, 1994.
 
 
 17
 Spears was able to meet the March 1 deadline, but only partially. He filed a brief that day, but it was not accompanied by any "affidavits or other documentary material controverting the movant's position" as required by Local Rule 56.1 (S.D.Ind.). Citing a "catastrophic computer failure," Spears filed what he called an "emergency" motion requesting one extra day to file his supporting materials. Some supporting documentation was filed the next day, March 2, but the filings did not end. A week later, Spears submitted additional materials--an amended response brief, an amended designation of materials in support of their response, and an amended statement of genuine issues. Not surprisingly, the defendants objected to Spears' late filings and moved to strike them.
 
 
 18
 In a comprehensive decision, Judge Tinder, for the district court, addressed the pending motions. First, he denied Spears' "emergency" motion for more time. Second, he granted the motion to strike Spears' supporting materials filed on March 2 but denied the motion to strike the responsive brief and statement of genuine issues that arrived on March 1. The judge also denied the defendants' motion to strike the statement of material facts included in plaintiff's response brief. Finally, the judge struck as untimely Spears' filings on March 9. With these rulings, the judge did not consider anything filed after March 1 in resolving the defendants' summary judgment motion.
 
 
 19
 In his summary judgment ruling, Judge Tinder noted that while Spears submitted a brief and a statement of material facts, his pleadings cited to documentary support which was not properly before him. He determined that the matters properly before him contained only unsubstantiated and conclusory factual allegations and conclusions of law, devoid of any specific facts necessary to controvert the facts set forth by the defendants. As dictated by Local Rule 56.1 (S.D.Ind.), the judge assumed "that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy...." Analyzing plaintiffs' legal theories against this framework, Judge Tinder concluded that none of them were supported by sufficient evidence and, there being no genuine issue of material fact, he granted the defendants' motion for summary judgment.
 
 
 20
 On appeal, Spears takes issue with Judge Tinder's decision denying his request for more time. He was seeking, after all, only an additional "twenty-four little hours." While at first glance the denial of a motion seeking such a short continuance seems harsh, we must decide if it was lawful, as Judge Tinder acted under Rule 6(b)(1), Federal Rules of Civil Procedure, which provides:
 
 
 21
 (b) Enlargement. When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order.... (Emphasis added.)
 
 
 22
 Rule 6(b)(1) gave Judge Tinder discretion to grant or deny Spears' request for more time. The question is, did he abuse his discretion? To answer the question we look not just at the request itself but also at what led up to the request. Viewing the record as a whole, we cannot say that the judge's discretion was abused.
 
 
 23
 We live in a world of deadlines. If we're late for the start of the game or the movie, or late for the departure of the plane or the train, things go forward without us. The practice of law is no exception. A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored. The flow of cases through a busy district court is aided, not hindered, by adherence to deadlines. What happened in this case is that Judge Tinder, who had generously given Spears more than enough time to get his act together, decided there would be no more extensions, and we cannot say he was wrong to put his foot down as he did.
 
 
 24
 The defendants here filed their motion for summary judgment, accompanied by supporting documentation, on January 3, 1994. As we previously noted, the filing brought into play a local rule in the Southern District of Indiana which gave Spears 15 days to file a responsive brief together with his supporting documentation. Spears, therefore, had until January 18 to get his opposition to the motion in front of the court. Instead of getting his materials in on time, Spears filed a motion requesting additional time. There is certainly nothing particularly unusual about that, and Judge Tinder correctly granted the request. In granting the request, the judge was rather generous, giving Spears more than double the period of time ordinarily allowed for a response to a motion for summary judgment. The new deadline was February 22, 1994. Despite having successfully bagged a generous extension, Spears still did not get in under the wire. Instead, he filed another motion for an extension which he dubbed his "final" request. The "final" motion requested an extension until March 1, and Judge Tinder acceded to it. Both of the extensions, it should be noted, were granted over the defendants' objections, who were concerned because a trial in the case was scheduled to begin in May of 1994.
 
 
 25
 Because Spears called his second extension request his "final" one, it was incumbent upon him to be particularly diligent in ensuring that the deadline was met. The March 1 date was 42 days after Spears' response was originally due and 57 days after the defendants' motion for summary judgment was filed. Despite receiving all of this extra time--nearly three times the period allowed under the court's local rules--Spears did not meet the deadline. Although we are sympathetic with the circumstances of Spears' problems--he alleged a computer breakdown in his office on the due date--it seems to us that the problem was really that he waited until the last minute to get his materials together. Spears apparently neglected the old proverb that "sooner begun, sooner done." When parties wait until the last minute to comply with a deadline, they are playing with fire.
 
 
 26
 In exercising discretion regarding enlargements of time, courts should be mindful that the rules are "intended to force parties and their attorneys to be diligent in prosecuting their causes of action." Geiger v. Allen, 850 F.2d 330, 331 (7th Cir.1988). Deadlines, in the law business, serve a useful purpose and reasonable adherence to them is to be encouraged. As the Fifth Circuit noted in Geiserman v. MacDonald, 893 F.2d 787, 791 (1990):
 
 
 27
 [D]elays are a particularly abhorrent feature of today's trial practice. They increase the cost of litigation, to the detriment of the parties enmeshed in it; they are one factor causing disrespect for lawyers and the judicial process; and they fuel the increasing resort to means of non-judicial dispute resolution. Adherence to reasonable deadlines is critical to restoring integrity in court proceedings.
 
 
 28
 Judge Tinder was adhering to sound policy in this case when he stated:
 
 
 29
 The court, although sympathetic with Plaintiffs' circumstance, notes that it is a circumstance of the Plaintiffs' own making. If the court allows litigants to continually ignore deadlines and seek neverending extensions without consequence, soon the court's scheduling orders would become meaningless.
 
 
 30
 We also note that the decision to deny a further extension was considered against a backdrop of dilatory tactics by Spears. For example, on the eve of the close of discovery, Spears served several subpoena duces tecum seeking the production of countless documents. Judge Tinder noted that "the documents sought resemble a 'fishing expedition' " and that the lateness of the request was attributed solely to tardiness in pursuing the litigation. In leaving this issue we conclude by noting that we have combed the record and have found no evidence that convinces us that Judge Tinder abused his discretion in denying Spears' third request for more time and as we noted earlier, "that's the diff'rence a day makes, twenty-four little hours."
 
 
 31
 Our decision finding, as we have just discussed, no abuse of discretion by Judge Tinder moots Spears' argument that the grant of summary judgment itself was in error. Spears concedes, correctly we think, that the grant of summary judgment is unassailable if his late filed materials were not properly before the court. Because that is the case, we move to the last issue, Spears' challenge to an order that he pay $3,132.05 in costs associated with a response to a discovery request. The fees and costs were claimed by the defendants for work performed by their attorneys and for the expenses of Charles Huppert, a former corporation counsel for the city of Indianapolis.
 
 
 32
 The fee dispute stems from a set of subpoenas issued by Spears late in the discovery process which requested all documents of any kind in Huppert's files regarding the taxicab business in Indianapolis for the years 1970-1991. The defendants (not Huppert, who was an ex-employee of the City at the time) moved to quash the subpoenas, alleging that they were overbroad and came too close to the end of discovery to permit compliance. The defendants also claimed that the information requested was not relevant, was protected from disclosure by privilege, and that compliance would cause an undue burden.
 
 
 33
 Judge Tinder held a hearing on the matter and determined that the subpoena was too broad. Its scope was narrowed to the years 1983-1989. The judge also concluded that compliance with the subpoena would cause an undue burden, particularly the identification of documents subject to the attorney-client privilege. That finding led the judge to conclude that the costs associated with the request should be carried by Mr. Spears.
 
 
 34
 Rules 45(c) and 26(c) of the Federal Rules of Civil Procedure give trial courts considerable discretion in determining whether expense-shifting in discovery production is appropriate in a given case. Our review of the record here discloses no abuse of discretion on the part of the trial court on this point. The timing of the subpoenas, the wealth of materials sought--with the whiff of a fishing expedition apparent--and the privileged nature of many of the documents provided a sound basis for the court to order reimbursement under the rules. Spears' "new" argument, raised for the first time on appeal, that the documents sought were actually covered by Indiana's Access to Public Records Act will not be entertained here. By failing to raise the issue in the district court, the argument is waived. Were we to consider the argument, however, we would note that the request for production here came not under the Indiana act, but under a discovery request made in a federal lawsuit, and that fact alone would render the plaintiffs' argument on the point meritless at best.
 
 
 35
 For all of these reasons, we AFFIRM the orders of the district court.
 
 
 
 [1]
 Dinah Washington was not the original artist who did "What a Difference a Day Makes." Billboard magazine reports that it was first recorded by The Dorsey Brothers in 1934. Washington's version, however, made the song a classic