In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1368

MATTHEW YANCICK,

*Plaintiff-Appellant,*

*v.*

HANNA STEEL CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-cv-1339—**Joe Billy McDade**, *Judge.*

ARGUED OCTOBER 25, 2010—DECIDED AUGUST 3, 2011

Before WOOD, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Matthew Yancick brought a racially hostile work environment claim against Hanna Steel Corporation under 42 U.S.C. § 1981. Hanna Steel moved for summary judgment; the district court ruled on Hanna Steel's motion without considering Yancick's response brief or exhibits. Yancick's response was non-compliant with local rules, and the court declined to permit him additional time to file a rule compliant re-

sponse. The district court, after reviewing the record submitted by Hanna Steel, granted summary judgment in its favor.

Yancick, who is white, worked with Brad Johnson, who is African-American, at Hanna Steel. Johnson was a workplace bully; he was confrontational, rude, and disruptive in the workplace. Hanna Steel's workforce was predominantly white and Hispanic; out of the eighty workers, there was only one other African-American employee and he worked a different shift than Yancick and Johnson. In December 2005, Yancick was working with Johnson when a 940-pound steel coil fell on Yancick from a machine operated by Johnson, leaving Yancick with severe, permanent injuries. Yancick asserts that Johnson dropped the steel coil on him purposefully because of his race.

We affirm the district court's rulings. The district court did not abuse its discretion in declining to consider Yancick's response in opposition to summary judgment and based on the record submitted by Hanna Steel, Yancick's § 1981 claim fails. The record contains insufficient evidence for a jury to find that Johnson's offensive conduct before the accident was severe or pervasive. While Yancick's workplace injury was severe, no reasonable inference can be drawn that Johnson purposefully dropped the steel coil on Yancick because of race or that Hanna Steel was negligent in discovering the alleged racial harassment.

## I. Procedural Issue

### A. Background

On September 21, 2009, Hanna Steel filed its motion for summary judgment and on October 15, Yancick moved under Rule 56(f) of the Federal Rules of Civil Procedure for additional time to respond so he could locate two witnesses, Adriel Novoa[1] and Scott Terrell. The district court granted Yancick's motion, but warned, "Plaintiff will be allowed no further Rule 56(f) continuances or enlargements of time to respond to Defendant's motion for summary judgment."

On Friday, October 30, 2009, at 4:56 p.m., four minutes before the filing deadline, Yancick filed a motion for leave to file his response with excess pages, attaching his response brief (which was about 1,500 words over the allowed word limit) but not the referenced exhibits. Yancick sought leave to file his exhibits after the motion for leave was granted. Yancick's concern was that under the electronic case filing (ECF) system, the response brief was going to be referenced as an exhibit to the motion for leave and the exhibits to the response (if attached) would be off-numbered and not accurately correspond to the numbering cited in the brief. Yancick reasoned in his motion that "[s]ubmission of the exhibits as an attachment to this motion alters the ECF numbering system used when filing exhibits." Hanna Steel

---

[1] We refer to him as Adriel throughout this opinion because his brother, Jamil Novoa, is also mentioned throughout the opinion and referred to as Jamil.

objected, particularly because the response referred to, but did not attach, exhibits. Based on a review of Yancick's response brief, it appears he did not yet have a signed declaration from witness Adriel Novoa. The response brief stated that "Yancick's counsel is filing the unsigned declaration and will supplement it with the signed declaration as soon as it is received."

On November 10, 2009, before the court ruled on Yancick's motion, Yancick filed a motion for leave to file a response within page limits, attaching a response that met the page and type limitations of Rule 7.1(D)(5) of the Local Rules of United States District Court for the Central District of Illinois (CDIL-LR). Again, Yancick did not file his exhibits. Counsel for Yancick filed this motion after he was alerted in another case that Judge McDade was not accepting responses with excess pages. Hanna Steel objected, noting that Yancick still had not filed his exhibits. On November 13, Yancick filed his exhibits two weeks late. One of the exhibits was Adriel's declaration, dated October 31, 2009.

The district court denied Yancick's motions for leave on November 16, reasoning that Yancick failed to meet the extended response deadline, which required a Local Rule-compliant response brief with any referenced exhibit attached by October 30. The court indicated that it had "generously granted" the earlier motion for continuance under Rule 56(f) and that Yancick's last minute filing "virtually ensured that the Court would not have an opportunity to rule on the motion for leave until after the response deadline." The court also indicated that

Yancick's failure to include exhibits was "particularly suspect" and led to the reasonable inference that "counsel structured his 4:56 p.m. filing . . . so as to buy himself additional time to prepare exhibits in support of his summary judgment response brief."

Yancick moved to alter the November 16, order explaining that the exhibits were in fact ready to file before the October 30 deadline and providing reasons why he did not file them on that day, i.e., counsel did not believe he was entitled to file exhibits until the motion for leave was granted and he was concerned about the exhibit numbers not corresponding to the response brief. The court denied the motion, explaining, "The deadlines imposed in this case mandate action; they are not starting dates for intention or diligence. Plaintiff was required to file a complete and Local Rule compliant response by the deadline and failed to do so. Whether he intended to do so or worked diligently to do so is irrelevant." The court declined to consider Yancick's response brief or his disputed factual contentions when ruling on Hanna Steel's motion for summary judgment. The court stated, "Plaintiff is deemed to have admitted the contents of Defendant's Motion for Summary Judgment, pursuant to Local Rule 7.1(D)(2), and the Motion for Summary Judgment will be decided by the Court on the record now before it." The court granted Hanna Steel's motion for summary judgment.

## B. Order

We review the district court's decision not to consider Yancick's response in opposition to summary judgment

for an abuse of discretion. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006). Yancick was given an extension until October 30 to file his response; he was expressly told that no further Rule 56(f) continuances or enlargements of time to respond would be granted. On October 30, Yancick filed a motion for leave to file his response to defendant's motion for summary judgment with excess pages, attaching his proposed response brief without the referenced exhibits. Yancick's counsel incorrectly assumed that the district court would grant the motion and allow him to file his exhibits after the October 30 deadline.

Local Rule 7.1(D) states that "[a]ll motions for summary judgment and responses and replies thereto must comply with the requirements of this rule. Any filings not in compliance may be stricken by the court." CDIL-LR 7.1(D). This court has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010). Yancick's brief did not comply with the word limitations set forth in Local Rule 7.1, CDIL-LR 7.1(B)(4)(b)(1) and (D)(5), but more significantly, did not comply with the requirement that the non-movant support his response "by evidentiary documentation" and "[i]nclude as exhibits all cited documentary evidence not already submitted by the movant[,]" CDIL-LR 7.1(D)(2)(b)(2). Additionally, Rule 56 of the Federal Rules of Civil Procedure requires the opposing party's response to be supported by "affidavits or as otherwise provided" setting out specific facts that show a genuine issue for trial and

instructs that if the adverse party does not properly respond to a motion for summary judgment, "summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2) (2009). Accordingly, Yancick did not file a rule-compliant brief by the court-imposed deadline.

Yancick argues he was following this practice because other judges in the district routinely grant motions for leave to file excess pages and allow exhibits to be filed only after leave has been granted. This argument assumes that the motion for leave would be granted as a matter of course, which is at odds with the Local Rules, and incorrectly presumes that because other judges in the district routinely grant such motions, that all judges must. Yancick filed his motion within minutes of the deadline and by doing so, he risked the court denying the motion and deeming his response untimely.

Yancick argues that because his violation of the local rules was nonwillful, it should not cause him to lose his rights, citing to Rule 83 of the Federal Rules of Civil Procedure. Rule 83 provides that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." Fed. R. Civ. P. 83(a)(2). Rule 83 does not help Yancick. The requirement to file evidentiary matter in support of a response brief is more than a "requirement of form." The Advisory Committee Notes to Rule 83 state that it does not alter "the court's power to enforce local rules that involve more than

mere matters of form—for example, a local rule requiring parties to identify evidentiary matters relied upon to support or oppose motions for summary judgment." Fed. R. Civ. P. 83 advisory committee's notes, 1995 amend. Similarly, the failure to timely submit exhibits identified in Yancick's response rendered the filing deficient not only in form, but also in substance.

The issue then is whether the district court abused its discretion by not affording Yancick additional time to file a rule-compliant response, particularly where counsel indicated that he had the exhibits, but was waiting to file them until after the court ruled on the motion for leave. Rule 6(b)(1) of the Federal Rules of Civil Procedure provides in relevant part:

> When an act may or must be done within a specified time, the court may, *for good cause*, extend the time:
>
> > (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires . . . .

Fed. R. Civ. P. 6(b)(1)(A) (emphasis added). Because Yancick filed his motion for leave before the deadline expired, albeit within four minutes, Rule 6(b)(1)(A) applies and Yancick had to show good cause for his request to file exhibits after the deadline. Yancick did not show good cause.

Yancick claims he did not file the exhibits because they would have been attachments to the motion for leave and the exhibit numbers would not have corre-

sponded to those stated in the response brief. This reason is weak. Yancick could have noted the discrepancies in the numbering and sought to correct the numbering after filing or submitted the response and exhibits as a separate filing. What Yancick could not do was simply fail to file the exhibits, particularly where the district court stated that it would not grant any further continuances. The district court granted the first continuance so Yancick could secure Adriel's declaration, but in the response brief attached to the motion for leave, Yancick noted that he did not yet have a signed declaration from Adriel; it was apparently signed on October 31 (one day after the deadline). The district court did not abuse its discretion in finding that Yancick's failure to include exhibits was "particularly suspect" and led to the reasonable inference that "counsel structured his 4:56 p.m. filing . . . so as to buy himself additional time to prepare exhibits in support of his summary judgment response brief."

In *Spears v. City of Indianapolis*, 74 F.3d 153, 154 (7th Cir. 1995), the issue was whether the district court abused its discretion when it denied the plaintiff's request for one more day to respond to a defense motion for summary judgment. *Id.* The district court had granted the plaintiff two extensions to file his response and while he was able to meet the new deadline, he did so only partially. *Id.* at 156. He filed a brief by the deadline, "but it was not accompanied by any 'affidavits or other documentary material controverting the movant's position' as required" by local rules. *Id.* (citation omitted). The plaintiff claimed he had a "catastrophic computer failure," and filed an "emergency" motion requesting an

additional day to file his supporting materials. *Id.* Some supporting documentation was filed the next day, but the plaintiff continued to file material for another week. *Id.* The district court denied the emergency motion and granted the defendant's motion to strike any supporting materials filed after the deadline. *Id.*

This court held in *Spears* that the district court did not abuse its discretion in denying additional time to respond pursuant to Rule 6(b)(1), observing that:

> We live in a world of deadlines. . . . A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored. The flow of cases through a busy district court is aided, not hindered, by adherence to deadlines. . . .
>
> . . . .
>
> In exercising discretion regarding enlargements of time, courts should be mindful that the rules are intended to force parties and their attorneys to be diligent in prosecuting their causes of action.

*Id.* at 157 (quoting *Geiger v. Allen*, 850 F.2d 330, 331 (7th Cir. 1988)). While the circumstances of the plaintiff's problems (a computer breakdown) evoked sympathy, it seemed that his problem really was that "he waited until the last minute to get his materials together." *Id.* He "apparently neglected the old proverb that 'sooner begun, sooner done'" and that "[w]hen parties wait until the last minute to comply with a deadline, they are playing with fire." *Id.*; *see also Raymond*, 442 F.3d at 607 (holding that strict enforcement of summary judgment

deadlines is "justified in light of the district court's significant interest in maintaining the integrity of its calendar.") (quotations omitted).

Similarly, Yancick's counsel took a huge risk by waiting until the last minute to file his motion for leave to file a response with excess pages. Yancick's counsel was well aware of Judge McDade's enforcement of deadlines. On October 2, 2009, Judge McDade ruled against that same attorney in another case where he attempted to file his response to summary judgment a day late. *Shah v. Am. Bottling Co.*, No. 07-cv-1042, 2009 WL 3229405, at *1-2 (C.D. Ill. Oct. 2, 2009). Yancick's counsel should not have assumed he would be granted additional time to file his exhibits. The district court properly found that Yancick's request was not made in good faith. While this result may seem harsh, we do not find that it was an abuse of discretion for the district court to require adherence to a deadline that it had previously informed counsel it would not extend.

## II.  Summary Judgment

### A.  Background

We recount the story in the light most favorable to Yancick. Hanna Steel provides steel tubing and pre-painted steel to distributors and manufacturers. Yancick was employed at Hanna Steel from 2003 until December 12, 2005, when a steel coil fell on his legs in a work-related accident, severely injuring him. Yancick, who is white, asserts that his former co-worker, Johnson, who is

African-American, intentionally dropped the coil on him out of racial animus. Johnson became employed at Hanna Steel in the fall of 2004; he worked the same shift as Yancick. Hanna Steel employed approximately eighty workers and only two were African-American. The other African-American employee worked a different shift.

Hanna Steel has a policy against all forms of harassment and directs employees to report harassment to Human Resource Manager David Monroe or General Manager Richard Daniel, and provides a toll free number at which to reach them. Yancick had a copy of the policy and Monroe addressed it in a September 15, 2003 meeting that Yancick attended. A memo addressed to all employees from the September meeting stated, "If you believe you are being harassed, you must immediately report the matter, either to your General Manager or to me [David Monroe] at 1-800- . . . ." Yancick signed an acknowledgment in January 2005 "stating that [he] was aware of what was considered harassment, what to do in case of harassment or anything racial or anything hate related . . . and know[s] there is to be no toleration of harassment of any type." As a condition of his employment, Yancick pledged "to report promptly, to [his] General Manager or to Hanna's Director of Human Resources David Monroe (1-800-. . .), all instances of harassment that happen to [him] or that [he sees] happening to other Hanna employees." The chain of command at Hanna Steel was Mike Duncan (Yancick's immediate supervisor), Sergio Becerra, Sr. (Plant Manager), and then Daniel (General Manager). Yancick was aware

of the chain of command. Although Duncan was Yancick's immediate supervisor, he had no authority to hire, fire, transfer, or discipline any Hanna Steel employees.

For the first several months of Johnson's employment, he and Yancick had a friendly relationship. Yancick testified that "when [Johnson] first started he was incredibly friendly and outgoing." Their relationship, however, began to deteriorate in 2005. In January 2005, Yancick was talking to another employee when Johnson approached them and said: "You're fucking talking about me." Yancick explained that they were not, but then Johnson raised his fist in what Yancick believed was a black panther or black power symbol. Johnson did not make any other remarks when making this gesture. Yancick testified, "I didn't feel like [Johnson] was going to strike me, but he was making a very powerful statement." Later that year, Yancick observed Johnson make that same gesture to another white co-worker. Again, Johnson did not say anything to accompany the gesture. Other employees witnessed Johnson raise his fist and discussed it with Yancick. Yancick did not report these incidents to any supervisor or manager of Hanna Steel.

The next incident occurred around July 2005, when Johnson came up to Yancick with an attitude and asked why he had a better radio and nicer boots. Yancick responded that "this is the radio given to me. I spent an extra $70 to get these boots." Johnson responded: "Oh, this is how it's going to be, huh?" Yancick mentioned this incident to Hershel Hicks, the lead man of Yancick's crew. Yancick said that the confrontation had an "uncom-

fortable air to it" and that Johnson's attitude "just doesn't make any sense." Yancick, however, did not say that race was a factor.

Around that same time, Yancick was on his way to get a coil and Johnson walked up to him like he was "getting ready to pounce" and came nose to nose with Yancick. Yancick just stood there until Johnson said, in a civil tone, "May I get a coil behind you." Yancick responded "sure" and got out of the way. Yancick explained why he thought Johnson behaved that way: "It felt like it was territorial or that Alpha-dog syndrome. I'm a big guy. . . . It just felt like little big man syndrome. Brad [Johnson] is a very powerful individual. He was very, very, very muscular, but I wasn't going to work in an environment where I'm bullied every day." Yancick reported this incident to his immediate supervisor, Duncan. Yancick testified that race was not a part of that incident.

On several occasions, Johnson used the epithet "nigger" around Yancick. He would often (weekly and sometimes multiple times in one night) say to someone, "you fucking talking about me," or "you talking about this nigger." Yancick heard Johnson say the word "nigger" in this context about ten times. Johnson came up to Yancick one day and out of the blue said, "if you want to see me kill somebody, call me a fucking nigger." Yancick reported Johnson's use of the word "nigger" to Duncan at least three times. Yancick testified that several times he informed Duncan that Johnson has a problem with whites or Mexicans. Duncan would say that unless

there is a witness, he could not do anything. Duncan told Yancick that if he had to be around Johnson, try to be with somebody else.

Yancick explained that when he was allowed to go home early because work was slow, Johnson said, "[T]hey let you go, but they keep my black ass here. They keep me here to work . . . ." Yancick said there was rage in his statement. Yancick reported this incident to Duncan. Duncan said the same thing, "Unless I have a witness, I can't do anything." Yancick described another incident where he was talking to an employee about his name and heritage and Johnson interjected, "I don't know what my name was because my heritage was I was a fucking slave." Yancick said, "I'm sorry that happened," and Johnson responded, "Yeah, you should be." Yancick testified that there were "a lot of things [concerning Johnson] I told Mike Duncan about over and over again, and it got to the point where he's like if you don't have a witness, don't bother me. You're just wasting my time."

Johnson failed to comply with workplace policy regarding meetings and equipment, and at times, was disruptive. Yancick testified that Johnson got away with a lot more than other employees and acted with "rage ready to be unleashed." He stared and leered at co-workers, bumped into them, invaded personal space, and on a few occasions was physically aggressive. Yancick witnessed Johnson bully his closest friends at Hanna Steel, Adriel, a Hispanic employee, and Larry Andrews, a white employee. Yancick saw Johnson knock Adriel

out of his way and smack Andrews in the head. While Yancick reported some incidents to Duncan, the record doesn't indicate that Yancick conveyed to Duncan that Johnson was physically violent or threatening.

There were several reasons why Yancick thought Johnson may have acted this way. For example, he says that "[a] lot of this, . . . stemmed simply from the fact I was not the straw house that could be blown down. I was not somebody that cowered from him and that aggravated the hell out of him, but, like I said, I will not work in an environment where I have to be afraid every day to do my job. I did my most to avoid conflict with him." He further testified that "what a lot of it I think boiled down to was the fact that he couldn't make me bend or make me cower." Yancick believed Johnson was picking on his friends because he could not get to Yancick. Yancick testified that if Johnson could not beat up the big guy (referring to himself), then he was going to stomp on his buddies.

Yancick also believes that Johnson was a racist. He testified that the manner in which Johnson spoke was an indication that he acted based on race and stated, "I know [Johnson] was racist. There was never a doubt about that in my mind how he acted towards me and others." Yancick testified that Johnson "hated everything white." He stated that Johnson was not a bully to the other African-American employee at Hanna Steel, but he only observed them interact briefly during shift changes. Yancick also testified to other reasons he thought Johnson's behavior changed, including his spec-

ulation that Johnson was using steroids or was upset that he was transferred from the slitter job to crane operator, which paid less.

On a few occasions after Yancick complained to Duncan, Duncan responded by saying that Johnson is the "biggest racist I've ever seen in my life." Duncan did not take any action and Yancick never followed up with Human Resource Manager Monroe or General Manager Daniel even though he was aware that Hanna Steel's policy against harassment informed employees to direct their complaints to these individuals. Despite his problems with Johnson, Yancick testified that he enjoyed working at Hanna Steel and loved his job.

Other co-workers testified about Johnson's workplace behavior. Johnson was confrontational with Andrews, and Andrews witnessed Johnson raise his fist in what he believed to be the black power symbol. Andrews informed Duncan he thought Johnson might be a racist. Duncan told Andrews to stay away from him, but agreed that Johnson might be a racist. Shortly before Yancick's injury, Andrews also had a discussion with Plant Manager Becerra and Duncan concerning his complaints about Johnson's harassment. The record does not provide any specifics about what was addressed during this meeting or that Andrews' complaints were race-related. Andrews testified that other than Johnson raising his fist, there was nothing that Johnson did or said that he would interpret as having to do with race. The record reveals that Johnson also made complaints against Andrews. Becerra told Andrews that the only

thing that could be done would be to fire both of them if Andrews wanted to press the issue. Because Andrews wanted to keep his job, he decided not to press the issue.

Another employee of Hanna Steel, Nicholas Joestling, testified that he had confrontations with Johnson that he believed boiled down to the fact that Johnson did not like white people. Joestling's opinion was based partially on his observation of Johnson interacting differently with James Parker, the only other African-American employee at Hanna Steel. He testified: "[I]f you'd see the way he would interact with James compared to every other guy in the plant, you know, it doesn't take a rocket scientist to figure it out. . . . It all seemed to boil down to he just didn't like white people . . . to see him interact with somebody that wasn't white compared to every other person in there . . . ." There is no indication in the record that Joestling reported these occurrences to his supervisor.

Jamil, Adriel's brother and also a Hanna Steel employee, helped Johnson get his job at Hanna Steel. They were "best friends," but that changed after Johnson started working at Hanna Steel and eventually they stopped talking altogether. Johnson would stare at Jamil in a hostile manner while raising his fist in the air. Johnson told Jamil that it was okay to call him the "N word." On numerous occasions, Johnson accused Jamil and his brother of trying to get him in trouble or fired or would say things like "everybody's out to get [me] fired." Jamil testified that on at least one occasion, Johnson called Jamil and Adriel "stupid Mexicans," and on another occasion, said

generally, "stupid white people" and that white people were trying to get him fired. Johnson was aggressive toward Adriel and bullied him at work by staring at him and pushing him around. At the gym (outside of work), Johnson threatened Jamil that he was going to break his back and grabbed Adriel by the throat. Johnson also pushed Adriel (by bumping into him hard) at work. Jamil complained to Duncan many times (at least ten) mainly about things that happened to his brother at Hanna Steel. The record doesn't indicate specifically what Jamil told Duncan, but presumably he told Duncan about the pushing incident. Duncan told Jamil that he could not do anything because there were no witnesses.

Jamil witnessed Johnson show hostility toward other African-Americans outside of work. Jamil attested that "[t]his was consistent with my observations of Brad Johnson's attitude he sometimes displayed toward coworkers at Hanna Steel; he was just an aggressive guy who tried to act tough at times with everyone, white, black or whatever color." Jamil testified that Johnson was just mean and that he was "mean with everybody."

Yancick was an "end coater" at Hanna Steel. He painted both ends of a cut coiled piece of steel and moved it down the conveyor for further production. An end coater, this case Yancick, paints one side of the steel coil on a turnstile (or tree) and then another worker, in this case Johnson, controls a lift table (or arbor machine) that picks up the coil. The table can be brought to a vertical or horizontal position hydraulically. While in a vertical position, the table is moved forward toward the

turnstile and the horn (or arbor) on the table is extended to retrieve the coil. Once the coil is retrieved, the table is moved back about four feet, so the end coater can paint the other side of the coil. Once the coil is painted, the table is placed in a horizontal position (referred to as laying down the "back-ender") and the horn is retracted to transfer the coil onto the conveyor. (The parties have used differing terminology to describe the process involved here; we have attempted to simplify that terminology).

An employee controls the table from a control panel that is approximately two to six feet behind the end coater. There are four knobs and a toggle switch on the control panel. One knob turns the table either horizontally or vertically, another extends the horn, another lifts up the entire arbor assembly to pick up the coil, and another activates the rollers on the table to move the coil onto the conveyor. The toggle switch moves the machinery forward or backward. The knobs are spring loaded; they must be turned against pressure for about five to seven seconds to complete the process activated by that knob. For example, it takes five to seven seconds of continuous pressure for the horn to retract completely. If the operator lets up on the knob, the horn will stop retracting. Yancick testified that the control panel was simple to use and was labeled one, two, three, four so that employees could easily follow the proper sequence.

While Yancick was painting a 940-pound coil on the turnstile and the table was vertical and moved back toward the conveyor, Johnson retracted the horn, causing

the coil that was resting on it to roll off toward Yancick. The coil hit Yancick's legs, resulting in severe injuries. There is no reason to turn this knob when the table is vertical. Johnson turned the wrong knob and held it for five to seven seconds while the horn retracted, allowing the coil to fall toward Yancick. The next step in the process was to turn the table horizontal, then retract the horn, so that the coil could be moved onto the conveyor. While one person is finishing painting a coil on the turnstile, the controller could be "laying down the back-ender and going ahead and sending the next coil down the line" on the conveyor. Yancick had trained Johnson on the control panel and at the time of the incident, Johnson had been an operator for four days. The record indicates that Johnson was talking to another co-worker at the time of the incident, and Yancick, painting a coil, had his back to Johnson.

After this incident, Daniel called Yancick and Yancick said to him, "According to your handbooks, [Johnson] should have been fired almost a year before my injury. . . . Can you explain to me why you didn't do your job and I did mine and I get crushed?" Daniel responded: "Well, that racism went both ways." Duncan also went to speak to Yancick after the accident and said, "[Johnson] had it out for [you]" and that Yancick "took one for the team." Yancick testified that he did not know what Johnson's motivations were in dropping the coil, but believed it had to do with him being a racist.

Other employees operating the control panel have accidentally dropped a steel coil from the table, but they

have done so when removing the coil from the turnstile, not after the table has been moved back to the conveyor. One employee testified that he almost dropped a coil because he hit the wrong control and began retracting the horn when there was a coil on it.

## B. Order

Yancick's failure to respond to Hanna Steel's statement of facts in its summary judgment motion was deemed an admission of those facts. CDIL-LR 7.1(D)(6). Because Yancick's statement of disputed facts was not properly before the district court, the court could accept as true the undisputed facts set forth by Hanna Steel, but had to view those facts in the light most favorable to Yancick. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). Hanna Steel still had to show that summary judgment was proper given the undisputed facts. *See Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992) ("Where the evidentiary matter in support of the motion [for summary judgment] does not establish the absence of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented.*") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

As we have previously stated, "[e]mployment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes . . . .'" *Greer v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (citations omitted). The district court decided the motion for summary judg-

ment on the record presented by Hanna Steel and both parties indicated that Judge McDade addressed the entire record before him when ruling on the merits of Hanna Steel's motion. Accordingly, even though the district court did not need to search the record for disputed facts, we have reviewed the record submitted by Hanna Steel, and in particular, Yancick's citations to that record. Based on that record, we find that summary judgment was properly granted in favor of Hanna Steel.

Yancick brought this racially hostile work environment suit against Hanna Steel pursuant to 42 U.S.C. § 1981. He claims that Johnson was hostile to him because of his race and that he informed Duncan of the hostile work environment, but Duncan did not take any action to remedy the situation. He contends that Johnson purposefully dropped the steel coil on him and that all the incidents leading up to his injury are sufficient to show that Johnson dropped the coil because Yancick was white.

We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). As such, we cite to both § 1981 and Title VII cases. For Yancick to succeed on his § 1981 claim, the record needed to contain sufficient evidence to create a material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a

basis for employer liability. *Id.* at 390. The district court found that Yancick could not show that Johnson's harassment was because of race, was severe or pervasive, or that there was a basis for employer liability.

We begin by analyzing Johnson's actions before Yancick's injury. We find that taken as a whole, the facts do not lead to a reasonable inference that the harassment was pervasive or severe or motivated by race. We do not focus on discrete acts of individual employees when evaluating a hostile work environment claim, but must consider the entire context of the workplace. *Vance v. Ball State Univ.*, Case No. 08-3568, ___ F.3d ___, 2011 WL 2162900, at *7 (7th Cir. June 3, 2011). To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose. *Vance*, 2011 WL 2162900, at *6. Further, the plaintiff must show that the alleged harassment was both subjectively and objectively so severe or pervasive that it altered the conditions of his employment. *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010). "In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quotations omitted). We will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating. *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 567 (7th Cir. 2000).

Yancick does not allege that he was the target of any racial slurs, epithets, or other overtly race-related behavior. Yancick believes that Johnson may have raised his fist as a black power symbol, but there is a lack of support showing that Johnson's gesture was meant as a racial attack. And there is no evidence that Johnson wanted or attempted to harm Yancick or that Johnson said anything to Yancick to make him feel physically threatened. Johnson did tell Yancick that "if you want to see me kill someone, call me a fucking nigger," but there is no evidence that Yancick reported this statement to any supervisor or found it physically threatening. *See, e.g., see Scruggs v. Garst Seed Co.*, 587 F.3d 832, 836 (7th Cir. 2009) (occasional inappropriate comments, including that the plaintiff was "made for the back seat of a car" and looked like a "dyke," did not rise to the level of objectively hostile work environment).

Yancick also testified that he witnessed Johnson bully his two closest friends, Adriel and Andrews. Yancick believes that this was because of their races (Hispanic and white, respectively), but Yancick did not witness Johnson make any racial slurs or derogatory remarks to them. While Johnson made the comments "stupid white people," and "white people are trying to get me fired," these comments were not directed at Yancick or even made in his presence.[2] "[I]ncidents directed at others and

---

[2] It does not appear that the district court considered this testimony that was in the record, but not cited in the

(continued...)

not the plaintiff . . . do have some relevance in demonstrating the existence of a hostile work environment." *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (internal quotations omitted). However, the more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace. *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007) (If the offense is "based purely on hearsay or rumor . . . it is less confrontational [and] less wounding than offense based on hearing or seeing"). Johnson's conduct toward other co-workers, while troubling, is insufficient to alter the conditions of Yancick's employment such that it created an abusive working environment.

Yancick's inaction in following up on his complaints or taking them up the chain when no apparent action was taken by Duncan, belies the notion that Johnson's harassment was severe or pervasive. Yancick had Hanna Steel's harassment policy and knew that harassment complaints should be directed to Monroe or Daniel, but

---

[2] (...continued)
defendant's statement of facts. The defendant's statement of facts focused primarily on Johnson's conduct toward Yancick, not his co-workers; the district court similarly focused on Yancick's interactions with Johnson. As noted, the district court could accept as true the material facts submitted by the defendant and did not need to search the record to find facts favorable to Yancick. *See Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000). We could similarly disregard these facts on appeal, *id.*, but for completeness, we address them, and find that they do not change the result.

instead of contacting these individuals, he continued to complain to Duncan. For the most part, his complaints to Duncan focused on Johnson's general hostility in the workplace, not racial tension. This is probably because there were several reasons why Yancick believed Johnson harassed him. Yancick testified that for the first several months of Johnson's employment, he and Yancick had a good relationship and that when Johnson first started he was friendly and outgoing. Yancick said that began to change in early-to-mid 2005 and gave several reasons why he thought that was the case, including "the Alpha-dog syndrome," transfer of jobs, steroid use, and racism. Yancick testified that he thought Johnson might have targeted him because Yancick wouldn't succumb to Johnson's intimidation.

Despite Johnson's disruptive behavior in the workplace, Yancick testified that he did not allow Johnson to intimidate him and loved his job. Even though Johnson may have made some gestures or comments that were racial in nature, Yancick hasn't established that Johnson's conduct was anything more than immature and ignorant behavior. *See, e.g., Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 665 (7th Cir. 2005) (finding that despite the sexual and physical nature of the co-workers' conduct, the plaintiff "ha[d] not established that his encounters with [the co-worker] reflected more than personal animosity or juvenile behavior"); *see Scruggs*, 587 F.3d at 840-41 ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment."). Reviewing Johnson's conduct in the aggregate reveals "boorish conduct and unexplained animosities toward" his

co-workers (who all happened to be white and Hispanic), "but not to the extent that it meets the legal requirements of [finding a hostile work environment]." *Durkin v. City of Chi.*, 341 F.3d 606, 613 (7th Cir. 2003); *see also Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845 (7th Cir. 2009) (finding conduct seemingly worse than Johnson's pre-accident conduct inactionable).

Yancick cites to *Smith*, 189 F.3d 529, in support of his claim, but that case is distinguishable. In *Smith,* Gamble, the plaintiff's male co-worker, called her a "bitch," threatened to "fuck [her] up," pinned her against a wall, and twisted her wrist severely enough to damage her ligaments, draw blood, and eventually require surgical correction. *Id.* at 531. The plaintiff complained to her employer, who did little to remedy the situation, so she brought suit. *Id.* We found the evidence sufficient to show that her co-worker took these actions because of her sex. *Id.* at 533. The plaintiff produced affidavits from six other female workers illustrating that Gamble had a history of offensive interactions with his female co-workers, calling them "bitches," threatening to "kick [their] ass," and making other derogatory comments and vulgar threats of physical harm. *Id.* at 531. The evidence revealed that Gamble targeted female co-workers for his assaultive outbursts. *Id.* at 533. We held that "the explicitly gendered and sexually charged epithets Gamble hurl[ed] at his victims . . . may provide additional evidence that Gamble's hostility toward his female coworkers is based on their sex." *Id.* Gamble's assault on the defendant was "part of a broader pattern of behavior hostile to women." *Id.* at 533.

Unlike in *Smith*, the evidence in this case shows that Johnson was an equal opportunity bully. *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (section 1981 does not cover the "equal opportunity" harasser). As noted, Johnson made some remarks with racial under- tones, but he did not hurl racially charged epithets at his co-workers. He had a hostile attitude and was at times aggressive, but other than speculation, Yancick cannot connect Johnson's behavior with racial animus. There is evidence that Johnson may have been friendly with the only other African-American employee at Hanna Steel; however, they only interacted briefly during shift changes. Jamil, on the other hand, attested that outside of work, Johnson showed hostility toward other African-Americans. He testified that this was "consistent with my observations of Brad Johnson's attitude he sometimes displayed toward coworkers at Hanna Steel; he was just an aggressive guy who tried to act tough at times with everyone, white, black, or whatever color." Johnson only worked with white and Hispanic co-workers, so his hostility toward them cannot be viewed as singling out a group based on race. *Cf. Smith*, 189 F.3d at 533 ("One method of demon- strating that harassment is based on sex is to provide evidence of discrepancies in how the alleged harasser treats members of each sex in a mixed-sex workplace.").

We now must turn to the incident that led to Yancick's injury, because even "one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). Without question, purpose- fully dropping a steel coil on a co-worker qualifies as

egregious conduct. *See Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) ("We have held that assaults within the workplace create an objectively hostile work environment for an employee even when they are isolated.").

Thus, to proceed to trial, Yancick needed to produce sufficient evidence for a jury to find that Johnson purposefully dropped the steel coil on Yancick because of his race. *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994) (plaintiff must show that the hostility is based on a protected characteristic). Yancick argues that an inference can be drawn that Johnson acted purposefully in dropping the steel coil because of his racial hostility toward Yancick and his co-workers in the past, lay opinion testimony that Johnson is a racist, and Johnson's blatant mishandling of the machinery.

While it's true that some of Yancick's co-workers and his supervisor, Duncan, stated that they believed Johnson to be racist, this lay opinion testimony doesn't lead to a reasonable inference that Johnson dropped the steel coil on Yancick because he is white. Rule 701 of the Federal Rules of Evidence allows lay testimony of mental state as long as it is (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701; *see also United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008) ("We have held that lay opinion testimony regarding mental states is admissible under Rule 701."). The district court's decision to admit lay opinion testimony pursuant to Rule 701 is reviewed for an abuse of discretion. *Id.*

Yancick cites to *Bohannon v. Pegelow*, 652 F.2d 729 (7th Cir. 1981) to support his argument that the lay opinion evidence creates a question of fact. In *Bohannon*, we found that it was not an abuse of discretion for the district court to have admitted a witness' lay opinion testimony that the plaintiff's arrest was motivated by racial prejudice. *Id.* at 731. The defendant argued that the trial court abused its discretion in admitting the witness' testimony because the rest of her testimony did not contain any facts indicating social prejudice and as such, the opinion could not have been rationally based on her perception. *Id.* at 732. We disagreed because the district court had determined that the witness was present at the time of the arrest and the opinion, which was based on personal knowledge and rational perceptions, was helpful to the jury. We reasoned that the defendant's arguments went to the weight the evidence should be given, not its admissibility. *Id.*

*Bohannon* is distinguishable from this case. Unlike in *Bohannon*, Yancick's witnesses were not present when the coil fell, so they didn't observe Johnson and have no basis upon which to testify about his state of mind at the time of the accident. Further, the procedural posture of *Bohannon* sets it apart from this case. *Bohannon* involved our review for abuse of discretion of a district court's decision to admit lay opinion testimony of racial animus during a jury trial. The key issue in that case was not whether the defendant's actions were motivated by race, but rather, whether they were wanton and malicious, and there was "ample evidence from which the jury could have found malice." *Id.* at 733. Here, neither

party, nor the district court, addressed Rule 701 below, so there is no decision to review for abuse of discretion. The question here is whether the lay opinion testimony provides a sufficient basis for a reasonable jury to find that Johnson's actions were racially motivated. The witnesses provide no factual basis for their testimony. Joestling testified that he believed Johnson did not like white people based on his observations of how Johnson interacted with Parker (the other African-American who worked at Hanna Steel). But Johnson only interacted with Parker briefly during shift changes, and without more, such observations are not sufficient to raise a triable issue of fact.

The district court found that "[w]hile Plaintiff 'believed' that Johnson was a racist, there is no evidence that much of the objectionable behavior outlined in his deposition was race related." *Yancick v. Hanna Steel Corp.*, No. 07-cv-1339, 2010 WL 323505, at *5 (C.D. Ill. Jan. 20, 2010) (unpublished). The district court did not discuss the evidence related to Andrews', Duncan's, or Joestling's opinions of Johnson. Because the court properly declined to consider Yancick's statement of disputed facts, the court had no obligation to scour the record to find these facts. The district court considered Yancick's testimony and properly found that more was required to create a reasonable inference that Johnson dropped the coil on Yancick because of race. *See Wantuch*, 525 F.3d at 513-14 ("Attempts to introduce meaningless assertions which amount to little more than choosing up sides require exclusion for lack of helpfulness by Rule 701."); *see also Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659-60

(7th Cir. 1991) ("Discrimination law would be unmanageable if disgruntled employees—the friends of the plaintiff . . . —could defeat summary judgment by affidavits speculating about the defendant's motives."). "If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (quoting *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996)).

Not only is there a lack of evidence that Johnson's mishandling of the machinery was racially motivated, but the record also suggests that this was a careless accident, not intentional conduct. Yancick argues that an inference can be drawn that Johnson purposefully dropped the coil because he had been standing just a few feet from Yancick when he pushed down on the wrong knob against spring-loaded pressure for seven seconds until the arbor fully retracted and the coil came crashing down.[3] Yancick contends that this could not happen by accident because Johnson should not have been pressing down on any of the knobs. But two employees testified that while one person is finishing painting a

---

[3] Yancick testified in his deposition that co-workers told him that because of the way the incident happened and Johnson's blatant mishandling of the controls, that Johnson was trying to kill him. The district court found that this evidence was inadmissable hearsay. Yancick does not dispute this finding on appeal.

coil on the tree, the controller could be "laying down the back-ender and going ahead and sending the next coil down the line" onto the conveyor. Further, the evidence shows that coils have fallen in other circumstances and one employee testified that he almost dropped a coil because he hit the wrong control and began retracting the horn when there was a coil on it. Johnson was being trained by Yancick on the machine and had only been in that position for four days. There is no evidence that Johnson said anything to Yancick indicating that he was angry or had intentions to injure Yancick with the machinery. Yancick believes that Johnson dropped the coil intentionally because someone could not be so careless or reckless. But this is mere speculation and without more, Yancick cannot show that Johnson's conduct was intentional (or even if intentional, that it was racially motivated).

Because we conclude that Yancick hasn't presented facts upon which a reasonable jury could find that Johnson purposefully dropped the steel coil on him because of race, his claim fails as a matter of law. Although we could end our discussion here without addressing employer liability, we note for completeness that Yancick's claim would fail on this front as well. Because Johnson had no supervisory authority over Yancick, we apply a negligence standard to employer liability. *See Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758-59, 765 (1998)).

An employer is not liable for co-employee racial harassment "when a mechanism to report the harassment

exists, but the victim fails to utilize it." *Durkin v. City of Chi.*, 341 F.3d 606, 612-13 (7th Cir. 2003) (discussing sexual harassment). A complainant, however, need not specifically comply with the company's internal procedure if the employer is adequately put on notice of the prohibited harassment. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 786 (7th Cir. 2006) (finding that even though plaintiff didn't follow letter of harassment policy, the defendant couldn't reasonably claim that it did not have sufficient notice of harassment).

Hanna Steel had a reasonable procedure in place for detecting and correcting harassment, but Yancick didn't avail himself of that procedure. As a condition of his employment, Yancick pledged "to report promptly, to [his] General Manager or to Hanna's Director of Human Resources David Monroe (1-800-. . .), all instances of harassment . . . ." Yancick could have either followed the harassment policy reporting requirements or reported "the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1037 (7th Cir. 1998) (quotations omitted); *see also Bombaci v. Journal Cmty. Publ. Grp., Inc.*, 482 F.3d 979, 984 (7th Cir. 2007). Yancick did neither.[4]

---

[4] Yancick doesn't develop an argument as to constructive notice on appeal and therefore, he has waived any contention that the alleged racial harassment was sufficiently obvious to charge

(continued...)

Given Duncan's limited duties and authority (he was a low-level supervisor who had no authority to hire, fire, transfer, or discipline any Hanna Steel employees), Yancick's awareness of Hanna Steel's harassment policy and chain of command, and Duncan's unwillingness and refusal to address the situation, it was unreasonable for Yancick to believe that Duncan would convey his complaints up the ladder. *See Montgomery*, 626 F.3d at 390 (finding it unreasonable for plaintiff to believe that his crew chief was "the type of employee who could be expected to convey [his] complaints to someone who could stop the harassment" (quotations omitted)). Even if complaining to Duncan was initially reasonable, "any reasonableness quickly evaporated when [the plaintiff's] requests for relief went unanswered." *See Parkins*, 163 F.3d at 1038.

We further question whether the nature of Yancick's complaints would have been sufficient (even if directed to the right person) "to make a reasonable employer think there was some probability" that he was being racially harassed. *Id.* at 1035 (discussing sexual harassment). Similarly, although Andrews complained to Plant Manager Becerra about Johnson's workplace bullying, and notice may come from someone other than the victim, *see Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) ("[T]he employer's knowledge of the miscon-

---

4  (...continued)
Hanna Steel with knowledge of the conduct. *See Montgomery*, 626 F.3d at 392.

duct is what is critical, not how the employer came to have that knowledge."), there is no evidence that Andrews reported Johnson's conduct as race-related. The record doesn't reveal the content of Andrews' discussion with Becerra and vague complaints unrelated to racial hostility are insufficient to establish employer liability. *Montgomery*, 626 F.3d at 391-92 (finding insufficient notice where complaints were too vague to put plaintiff on notice of racial harassment). Accordingly, nothing in the record would allow a reasonable jury to conclude that Hanna Steel was negligent in failing to discover or remedy the alleged racially hostile environment.

AFFIRMED.